558 A.2d 535

**COMMONWEALTH of Pennsylvania**

v.

**Lamont C. BULLOCK, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 19, 1988.

Filed March 21, 1989.

Reargument Denied May 31, 1989.

270

John Packel, Assistant Public Defender, Philadelphia, for appellant.

Donna G. Zucker, Assistant District Attorney, Philadelphia, for Com.

Before CIRILLO, President Judge, and WATKINS and HESTER, JJ.

HESTER, Judge:

This is an appeal by Lamont Bullock, appellant, from the judgment of sentence imposed following his conviction by a jury of involuntary deviate sexual intercourse (IDSI), simple assault, and possessing an instrument of crime. Following the denial of post-verdict motions, the court sentenced ap-

pellant to ten to twenty years imprisonment for IDSI with a consecutive two-to-five-year term for possessing an instrument of crime.[1]

The record establishes the following facts. On September 28, 1987, at about 9:30 p.m., Donna Johnson walked one-half block to a neighborhood store to buy disposable diapers for her son. As she entered the store, she encountered appellant, whom she knew as "Pippie," and another man in front of the store. Appellant asked her for money; Ms. Johnson retorted that she had none. Upon exiting the store, Donna Johnson gave appellant's mother, who was sitting on the steps of her home near the store, a few cigarettes in response to her request. Appellant then crossed the street and asked Ms. Johnson to step into the vestibule of his mother's house. When Ms. Johnson complied, appellant put a knife to her throat and forced her to a third-floor bedroom.

Appellant ordered the victim to disrobe, while threatening her with the knife. He removed his clothing also and ordered the victim to lay on top of him on the bed. Appellant forced the victim to engage in oral sex four times. He then ordered her onto the floor and began fondling her. When Ms. Johnson continued to resist, appellant punched the victim in the right eye, causing it to bleed. Thereafter, in an attempt to distract appellant, the victim told him she had money in her pocket which he could have to buy drugs.[2]

Appellant then began searching the victim's clothes for money; when she dressed, he searched the bedroom and bathroom. During this time, Ms. Johnson moved toward the stairway, but the position of the bathroom door prevented her escape. When appellant returned to the bedroom to

1. The trial court ruled that simple assault merged with IDSI for purposes of sentencing.

2. Testimony at trial established that appellant was a heavy drug user and that the victim occasionally had taken drugs with him at his mother's house. *See* Notes of Testimony ("N.T."), 3/9/88, at 127–28, 241–60. Further, Ms. Johnson testified that at the time of the attack, appellant appeared "high," and she believed that the prospect of money with which to buy drugs would redirect appellant's interest in her. *Id.* at 74.

continue his search, the victim ran down the steps and out the front door past appellant's mother in search of police. N.T., 3/9/88, at 55–81.

Police Officer Richard O'Neill testified that while on patrol in a marked automobile in appellant's neighborhood on September 28, 1987, at approximately 10:30 p.m., the victim waved him down. She was crying hysterically and bleeding from the right eye. Through her sobs, Officer O'Neill learned she had been forced to perform oral sex on appellant several times, and he had punched her in the face. Ms. Johnson described appellant and referred to him by his nickname, Pippie. This information was broadcast over police radio. *Id.* at 156–58.

Meanwhile, appellant left his mother's home and approached two police officers in the neighborhood. *Id.* at 81, 167. Police Officer Kenneth Rossiter testified that appellant told Rossiter and his partner that he had been in a fight with a "bitch" and that she had fallen down the stairs. Officer Rossiter testified that appellant appeared to be "high" but did not smell of alcohol. Appellant then walked away. *Id.* at 166–68. Shortly thereafter, upon hearing the radio broadcast, the officers questioned appellant and detained him. The victim subsequently identified appellant as her attacker, and he was arrested. *Id.* at 171–72.

Appellant presents the following issues for our review: (1) whether the trial court erred in refusing to ask prospective jurors if they could read and write; (2) whether the trial court erred in denying evidence of prior sexual conduct between appellant and the victim; (3) whether the prosecutor engaged in misconduct during his closing argument to the jury; and (4) whether the trial court's decision to restrict access to the courtroom during the charge to the jury denied appellant his constitutional right to a public trial. We affirm.

■ Appellant first asserts that the trial court erred in failing to inquire whether prospective jurors could read and write. As the record reflects the selection of a competent and impartial jury, we reject appellant's claim.

Counsel for appellant requested, *inter alia*, that the court ask the jurors if they could read and write. The trial court refused to specifically ask that question, but advised counsel he would inquire as to the extent of their education and what schools they attended. The court further advised counsel to request a sidebar following voir dire if any pertinent questions were not asked. N.T., 3/8/88, at 7–9.

Appellant's argument is premised upon 42 Pa.C.S. § 4502(1), which provides,

### § 4502.  Qualifications of jurors

Every citizen of this Commonwealth who is of the required minimum age for voting for State or local officials and who resides in the county shall be qualified to serve as a juror therein unless such citizen:

> (1) is unable to read, write, speak and understand the English language[.]

He contends, notwithstanding each juror's ability to engage in an extensive colloquy with the court and to give understandable responsive answers to the questions posed, the court's failure to ask whether each juror could read and write English denied him the opportunity to eliminate jurors who he claims may not have complied with the requirements for service specified in the above statute.

A review of the record reveals that the trial court, following an outline of the pertinent legal principles and the salient facts of the crime, posed a number of questions to the panel as a whole. The court asked the panel members whether they could apply the law as given by the court; if they would give greater weight to testimony offered by a police officer; if they had a fixed opinion as to appellant's guilt; and whether they could be fair. The court also asked if any panel member lacked sufficient command of the English language to enable him to participate, and if any member had a physical or mental disability which would prevent him from performing his duty as a juror.

The court further asked the panel members whether they, a member of their family or a close friend had been the victim of a crime, or was employed in law enforcement;

whether they had any religious scruples which prevented them from passing judgment on another; whether they were acquainted with any of the parties or witnesses; whether they could be fair to both the Commonwealth and appellant; and whether they had ever before served on a jury. N.T., 3/8/88, at 18–45.

The court then engaged in individual voir dire of each panel member. The court asked each prospective juror his occupation, the length of time he had been so employed, his marital status, spouse's occupation, number of children, and children's ages. The court also inquired where each juror lived and for how long, what level of education he had attained and at what schools. *Id.* at 45–75. Furthermore, additional questions were asked of any juror who expressed concern with any of the issues posed to the panel as a whole.

At no time did appellant request follow-up questions concerning any prospective juror's literacy. However, appellant did request further questioning for a number of other reasons. *See e.g.,* N.T., 3/8/88, at 74–80.

The Pennsylvania Supreme Court reiterated the relevant principles governing the examination of veniremen, as set forth in *Commonwealth v. Drew,* 500 Pa. 585, 459 A.2d 318 (1983), in *Commonwealth v. Ingber,* 516 Pa. 2, 6, 531 A.2d 1101, 1103 (1987).

> It must be remembered the purpose of the voir dire examination is to provide an opportunity to counsel to assess the qualifications of prospective jurors to serve. It is therefore appropriate to use such an examination to disclose fixed opinions or to expose other reasons for disqualification. Thus the inquiry must be directed at ascertaining whether the venireperson is competent and capable of rendering a fair, impartial and unbiased verdict.

(Citations omitted).

There is nothing in the record to suggest that any of the jurors were unable to understand and communicate. Indeed, appellant fails to identify any incident that would

require a critical appraisal of the ability of the jurors who heard his case. Further, even if appellant could show that a disqualified juror sat on his case, he has not identified any prejudice, and we will not, as urged by appellant, "assume prejudice for the sake of ... fairness." Appellant's brief at 12. *Cf. Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (any claim that jury was not impartial must focus on jurors who ultimately sat); *Commonwealth v. Delligatti,* 371 Pa.Super. 315, 538 A.2d 34 (1988) (appellant fails to state how court's refusal to conduct individual voir dire prejudiced him); *see also United States v. Silverman,* 449 F.2d 1341 (2d Cir.1971) (inclusion in panel of a disqualified juror does not require reversal of a conviction unless there is a showing of actual prejudice).

The present case was based almost entirely on oral testimony, and the case involved an assessment of the credibility of witnesses. Even if a juror seated had been unable to read or write, the deliberations of the jury could not have been affected in any significant way. *See Bumpus v. Uniroyal Tire Co.,* 392 F.Supp. 1405 (E.D.Pa.1975).

The scope of voir dire rests in the sound discretion of the trial judge, whose decision will not be reversed absent a gross abuse of discretion. *Commonwealth v. Delligatti, supra; Commonwealth v. White,* 366 Pa.Super. 538, 531 A.2d 806 (1987). Finding no abuse of discretion in the present case, we reject appellant's first issue.

■ Appellant next argues that the trial court precluded him from proffering evidence of prior sexual conduct between appellant and the victim. He alleges that he sought to establish that he had engaged in consensual sexual acts with the victim many times prior to the date in question as well as on that specific date.

The Rape Shield Law, 18 Pa.C.S. § 3104, establishes the procedure to be followed when determining the admissibility of evidence of a victim's past sexual conduct.

### § 3104.  Evidence of victim's sexual conduct

(a) **General rule.**—Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

(b) **Evidentiary proceedings.**—A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

Appellant asserts that the trial court ruled that evidence of sexual activity only on the date in question was admissible, and this ruling deprived him of a fair trial.

The trial court, in its opinion, states the following concerning this issue.

[T]he defendant misreads the extensive, mostly academic, discussion on the dynamics and operation of the protections intended by the Rape Shield statute.  18 Pa.C.S.A. § 3104.  During the discussion the Court posed the question of whether the statute intended to prohibit defendant from popping the question to [the victim] on his mere allegation that he had had prior consensual sexual activity with her even if she would deny it; and, whether, if she denied it, defendant could prove it by independent evidence; whether remoteness of the prior consent is a factor to be considered in its admissibility.  N.T. 3/9/88, pp. 3–24.  For his part, and more pertinently, as the parties had known one another only for a year, the prosecutor agreed that he would not be objecting to the

general question, "Did you have prior consensual intercourse with defendant?" (id., pp. 18–21); contending only that, if she answered in the negative, as he expected her to, the defendant should be precluded from attempting to prove the fact by independent evidence as the trial would then deteriorate to proving a collateral incident. Id. Because of this and defense assertion that the prior consensual sex had occurred on the same day of the incident and that the accusation of rape followed when defendant refused to let her get away with the money she took from his pant's pocket, (id., pp. 16, 17), the Court made no decision on the other questions discussed. Trial court opinion at 5. Thus, the court asserts that appellant *chose* not to question the victim about prior sexual activity with him. We agree.

The Commonwealth contends that the trial court took the position that in any in camera review pursuant to 18 Pa.C.S. § 3104, it would be required to exercise its discretion in weighing the probative value of the proffered testimony and its relevance and admissibility. However, an in camera hearing was not held. The Commonwealth claims that the court reserved any ruling on the admissibility of the evidence, and appellant chose to forego its presentation to the jury.

Our review of the record reveals that the trial court acknowledged its duty under the Rape Shield Law to hold an in camera hearing. N.T., 3/9/88, at 10. The court also acknowledged that prior consensual sex acts between appellant and the victim were admissible. *Id.* at 11. It is clear, as argued by the Commonwealth, that the court had questions in two areas relevant to this issue: whether appellant's consent defense was viable in light of the victim's injury, and whether the court, in the exercise of its discretion, was free to determine 1) if the proffered testimony was relevant and admissible and 2) whether its probative value outweighed its prejudice. *Id.* at 10, 12, 15. This pretrial discussion was contemplative in nature, and at no

time did the court restrict appellant's evidence. In fact, the discussion concluded with the following exchange.

[Defense Counsel]: Is your Honor's ruling I'll be allowed to ask her about prior sexual contact?

The Court: Yes.

[Defense Counsel]: Fine.

. . . .

The Court: That's on the representation that he says that they occurred on or about that day, that at least that there was some sex before that day.

[Defense Counsel]: Yes.

We find no support in the record for appellant's claim that he was precluded from presenting evidence of prior sexual conduct between the parties. In his opening statement to the jury, following the above discussion with the court, counsel for appellant stated, "Lamont Bullock knows Donna Johnson. He's known her for awhile. He had sex with her before...." N.T., 3/9/88, at 49. Appellant cross-examined the victim about prior contact. Although defense counsel represented to the court that appellant would testify about prior sexual contact with the victim, *see id.* at 12–13, appellant chose not to take the stand. We conclude, therefore, based upon our review of the record and the applicable law, this issue lacks merit.

■ Next, appellant argues that the prosecutor impermissibly expressed his opinion concerning the evidence and the witnesses' credibility in his closing argument to the jury.

We are mindful that a prosecutor must limit his statements to the facts introduced at trial and the legitimate inferences therefrom, *Commonwealth v. Bricker,* 506 Pa. 571, 487 A.2d 346 (1985) (plurality opinion), and may not inject his personal opinion of a defendant's credibility into evidence, *Commonwealth v. Brawner,* 381 Pa.Super. 265, 553 A.2d 458 (1989). However, Commonwealth is afforded reasonable latitude in fairly presenting its version of the case to the jury. *Commonwealth v. Upchurch,* 355 Pa.Super. 425, 513 A.2d 995 (1986). The Pennsylvania Supreme

Court reaffirmed that we must apply the "unavoidable prejudice test as articulated in *Commonwealth v. Stoltzfus,* 462 Pa. 43, 337 A.2d 873 (1975), in determining the impact of prejudice in closing arguments.

> [W]here the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required. *Commonwealth v. Crittenton,* 326 Pa. 25, 31, 191 A. 358 (1937); *Commonwealth v. McHugh,* 187 Pa.Super. 568, 577, 145 A.2d 896 (1958). The language must be such that its "unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict." *Commonwealth v. Simon,* 432 Pa. 386, 394, 248 A.2d 289, 292 (1968). *See also, Commonwealth v. Meyers,* 290 Pa. 573, 139 A. 374 (1927). The effect of such remarks depends upon the atmosphere of the trial, *Commonwealth v. Dickerson,* 406 Pa. 102, 110, 176 A.2d 421 (1962); *Commonwealth v. Del Giorno,* 303 Pa. 509, 519, 154 A. 786 (1931), and the proper action to be taken is within the discretion of the trial court. *Commonwealth v. Silvis,* 445 Pa. 235, 237, 284 A.2d 740 (1971); *Commonwealth v. Simon, supra.*

*Commonwealth v. Johnson,* 516 Pa. 527, 532–33, 533 A.2d 994, 997 (1987); *see also Commonwealth v. Howard,* 375 Pa.Super. 43, 543 A.2d 1169 (1988).

Appellant claims first that the prosecutor repeatedly expressed his personal belief as to the credibility of witnesses. He cites to eight instances where the prosecutor prefaced his comments with "I think" and "one thing's for sure" and similar characterizations when referring to testimony.[3]

---

**3.** Appellant's claim that this prosecutorial argument was improper must be viewed in light of his own closing argument, which continually expressed *his* view of the trial testimony: "She was caught in a bald-faced lie," N.T., 3/10/88, at 10; "Now this I think is a very important part of her testimony," *id.* at 391, "She's making this up. . . . And I think you would find that a very curious part of this case," *id.* at 32.

It is clear that the prosecutor was explaining to the jury what he believed the record evidence established. We find no error in such advocacy. *See, e.g., Commonwealth v. Todt*, 318 Pa.Super. 55, 464 A.2d 1226 (1983) (argument including prosecutor's thoughts on what the jury could conclude did not require reversal); *Commonwealth v. Gwaltney*, 497 Pa. 505, 442 A.2d 236 (1982) (prosecutor's argument that "I think I proved to you [the witness] was lying" not reversible error).

Appellant asserts that the most egregious remark by the prosecutor "branded appellant a liar," appellant's brief at 21, when he stated to the jury, "Now, I didn't introduce that [statement] in my case to show you that Lamont was a nice guy. Let me tell you why I introduced it: I'd have to be an idiot to introduce it if I thought it was the truth." N.T., 3/10/88, at 86.

A reading of the record reveals that the above comment was the Commonwealth's response to a defense argument which focused primarily upon the credibility of the victim. In closing, defense counsel stated, "[The victim] was caught in a bald-faced lie and there's no way that she can get out of that," N.T., 3/10/88, at 10–11; "[The victim's testimony is] an attempt to explain a lie.... There's no other way around that," *id.* at 12; "You just can't rely on her testimony.... [S]he's making this up as she goes along.... She's willing to say anything now," *id.* at 31, 32; "Donna Johnson's testimony is not trustworthy," *id.* at 8.

The Pennsylvania Supreme Court has held that a prosecutor's remark concerning the credibility of a witness does not constitute reversible error where it is "motivated by, and was commensurate with, the prior attacks upon the credibility of" the Commonwealth's witnesses. *Commonwealth v. Stoltzfus, supra*, 462 Pa. at 62, 337 A.2d at 882. Here, the prosecutor was commenting on an issue of credibility which had been initiated by appellant. *See also Commonwealth v. Gwaltney, supra.*

Similarly, we reject appellant's claim that the Commonwealth argued facts not in evidence when referring to the

testimony of appellant's mother. At trial, appellant's mother, called as a prosecution witness, testified on cross-examination that the victim was at the witness's home earlier on the day of the attack and that she observed the victim exchange something for a small packet from a man on the street corner prior to entering the witness's home with appellant. N.T., 3/9/88, at 228–56.

On redirect, appellant's mother admitted that she had not told the prosecutor she had seen the victim in her home earlier that day. *Id.* at 259. The redirect examination concluded with the following exchange.

[The Commonwealth]: You didn't tell me anything about that ... did you?

[Appellant's mother]: I should have said something about it.

N.T., 3/9/88, at 260. In light of the above, we find no error in the prosecutor's argument to the jury that the witness had failed to tell him about matters she testified to on cross-examination.

Finally, appellant argues that the prosecutor labeled him a Nazi and cautioned the jurors that if they failed to convict appellant, it would be tantamount to the toleration of Nazi atrocities. This claim is based on the following.

I will give you one final analogy and then I will close. There was after World War II a minister who was questioned who was in Germany. By the way, this has nothing to do with the case on its facts, obviously, before [defense counsel] jumps up.

And he was near one of the death camps and they found out that—they had suspected people were dying there and they said to him, why did you not say anything? You were a minister. You were a man of the cloth, God's servant on earth.

Why did you not say what you knew to be the truth? And he said, well, first they came for the gypsies but I was not a gypsy, so I said nothing. And then they came for the communists but I was not a communist, so I said nothing. And then they came for the Jews but I was not

a Jew, so I said nothing. And then they came for me. And there was no one left to speak up for me.

Ladies and gentlemen, we have an obligation as citizens, you have an obligation as jurors, to speak out against injustice when the facts show it to be so. If you avert your eyes to say I do not like that person, I do not like who they are, is to do the greatest injustice of all, threatens all that is important in this society.

If the facts show, as I say they do, that Lamont Bullock committed all these three crimes, you must, regardless of how you feel about the people, say it is so. Thank you.

N.T., 3/10/88, at 98–99.

As stated earlier, the defense closing focused upon the credibility of the victim. The prosecutor did not characterize appellant as a Nazi, but made an analogy based on these facts independent of any mention of appellant. *Cf. Commonwealth v. Whitney*, 511 Pa. 232, 512 A.2d 1152 (1986) (prosecutor's reference to Adolph Hitler and other "people who do evil" not so inflammatory to have caused jury's sentencing verdict to be product of passion or prejudice).

While the prosecutor's analogy may have been intemperate, we do not believe its unavoidable effect was to prejudice the jury. *Commonwealth v. Johnson, supra.* The trial court continually advised the jury of its duties as a factfinder, N.T., 3/10/88, at 52, 54, and noted that the prosecutor's arguments were not evidence. *Id.* at 108–10. Accordingly, we reject this claim of error.

■ Appellant's final argument is that he was denied his right to a public trial by the trial court's refusal to allow spectators to enter or exit the courtroom during the court's charge to the jury. In response to this claim, the trial court stated:

The doors of the courtroom squeak audibly on opening and closing causing a distraction. We believe we have the duty and discretion to protect the proceeding from interruptions. *Commonwealth v. Thomas*, 346 Pa.Super. 11, 498 A.2d 1345 (1985); see generally, *Commonwealth*

*v. Berrigan,* 509 Pa. 118, 501 A.2d 226 (1985) (exclusion of public from voir dire not reversible error); *Commonwealth v. Howard,* 324 Pa.Super. 443, 471 A.2d 1239 (1984) (exclusion of defendant's sympathizers within court's discretion). Moreover, our order did not exclude the public; those that were already inside the courtroom could remain; those that were not were not precluded from entering before the charge. During the charge a court officer was posted outside to admit any member of the public that had immediate business before the Court. The closing of the court was brief and reasonable under the circumstances, far from the hyperbolized complaint that defendant was denied a public trial. The witnesses, defendant's family and friends and some spectators, as well as the jury, provided the elements of a public trial. The trial remained a public one at all times.

Trial court opinion at 9–10.

Members of the public were free to remain in the courtroom during the court's charge. Thus, the protections guaranteed by the right to a public trial were not offended, and we reject appellant's claim.

Judgment of sentence affirmed.