559 A.2d 50

**COMMONWEALTH of Pennsylvania**

**v.**

**Roy SLOCUM, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 29, 1988.

Filed May 22, 1989.

430

Anne M. Nelson, New Jersey, for appellant.

Amil M. Monora, Assistant District Attorney, Scranton, for Com., appellee.

Before McEWEN, MONTEMURO and KELLY, JJ.

KELLY, Judge:

Appellant was convicted of rape and related offenses with regard to his sexual abuse of his teenage daughter. On appeal he contends: counsel was ineffective in failing to adequately question prospective jurors regarding whether they, or friends, or relatives had been victims of similar crimes, or whether they had been exposed to movies or other media presentations relating to incest; prosecutorial misconduct required a new trial; and juror misconduct required a mistrial. We find no merit in the contentions and affirm judgment of sentence.

## Facts and Procedural History

Between June of 1983 and January of 1984, appellant engaged in a continuous course of sexually abusive conduct toward his fourteen year old daughter. The abuse occurred after appellant had been granted custody of his daughter, who had previously resided with his former spouse and in a foster home. The assaults, which involved non-consensual sexual fondling, usually occurred late in the evening after he closed the bar he operated in Gouldsborough, Pennsylvania. On January 3, 1984, appellant called his daughter into

his bedroom and proceeded to forcibly rape her. No one else was home at the time.

The victim made no report of any of the incidents of incestuous abuse to anyone until ten days after the rape. After watching a television movie about incest entitled "Something About Amelia" she confided to a friend that she too had been incestuously abused. The next day she told her school counselor, and later she repeated the same information to case workers from the County Children and Youth Services Offices.[1]

At trial appellant contended that his daughter had fabricated the charges because of conflicts between him and her regarding her poor grades, misconduct in school, and dating relationship with a male 10 years her senior. Despite extensive efforts to impeach her testimony as not credible on these and other grounds,[2] the jury credited the victim's testimony and convicted appellant of rape, indecent assault, and indecent exposure.

Post-verdict motions were filed, evidentiary hearings were conducted, and eventually the post-verdict motions

1. The impact of the show was not peculiar to this victim. Rather, John Crewdson, then day metropolitan editor of the Chicago Tribune, has reported:

> Nearly half of those who watched television that night were watching *Amelia,* and when it was over, child-abuse telephone hotlines across the country began to ring. The callers numbered not in the hundreds or the thousands, but in the tens of thousands. They included children who said they were being sexually abused, children who thought their friends were being abused, teachers who thought their students were being abused, mothers who thought their daughters and sons were being abused, grown women and not a few men said they had been abused as children—even a handful of child abusers who wanted help.

Crewdson, *By Silence Betrayed: Sexual Abuse of Children in America,* at ix (1988). What portion of the reports spawned by *Amelia* were well-founded evidence of a productive new awareness and what portion were merely the unfounded by-product of heightened sensitivities, is of course a matter of conjecture. In this case, a jury has been convinced that *Amelia* had its intended effect on an actual victim.

2. While it is not necessary to detail the other grounds here, it suffices to say that they were typical of the aggressive adversarial attempts commonly used to discredit victims of sexual assault by suggesting every possible defect of conduct, character, and reputation.

were denied. Appellant was sentenced to a two to four year term of imprisonment. This timely appeal followed.

## I.  *Ineffective Assistance/Voir Dire*

■  Appellant first contends that counsel was ineffective in failing to conduct adequate *voir dire* relating to potential bias based on the nature of the charges. Appellant argues that counsel was ineffective in failing to question jurors *individually* on *voir dire* as to whether they, or their friends, or relatives had been victims of similar abuse, and whether they had viewed any movies or other media presentations relating to incest. We cannot agree.

■  Counsel is presumed competent. In order to establish ineffectiveness, appellant must establish that: an act or omission was arguably ineffective; no objectively reasonable basis designed to effectuate appellant's interests could exist for the act or omission; and, but for the act or omission challenged there is a reasonable probability that the result would have been more favorable to appellant. *See Commonwealth v. Davis*, 381 Pa.Super. 483, 554 A.2d 104 (1989); *Commonwealth v. Carelli*, 377 Pa.Super. 117, 546 A.2d 1185 (1988) (allocatur denied). In assessing appellant's claim that counsel was ineffective during the conduct of *voir dire* we must consider the limited role counsel plays in *voir dire* in non-capital trials in Pennsylvania.

■  The sole legitimate purpose of *voir dire* is to ensure selection of a competent, fair, and impartial jury. *Commonwealth v. Drew*, 500 Pa. 585, 588–89, 459 A.2d 318, 320 (1983); *Commonwealth v. Hathaway*, 347 Pa.Super. 134, 142–43, 500 A.2d 443, 447 (1985); *Commonwealth v. Bullock*, 384 Pa.Super. 269, 273–274, 558 A.2d 535, 537 (1989); *Commonwealth v. Newman*, 382 Pa.Super 220, 237, 555 A.2d 151, 159 (1989). While the trial court must provide reasonable latitude for counsel to discover and expose grounds to challenge members of the venire for cause, the court must also consider the countervailing privacy interests of the members of the venire. The United States Supreme Court explained in *Press Enterprise Co. v. Supe-*

*rior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), that:

The jury selection process may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the public domain. The trial involved testimony concerning an alleged rape of a teenage girl. Such questions may have been appropriate to prospective jurors that would give rise to legitimate privacy interests of those persons. For example a prospective juror might privately inform the judge that she, or a member of her family, had been raped but had declined to seek prosecution because of the embarrassment and emotional trauma from the very disclosure of the episode. The privacy interests of such a prospective juror must be balanced against the historic values we have discussed and the need for openness of the process.

*To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection* and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record.

464 U.S. at 511–12, 104 S.Ct. at 825, 78 L.Ed.2d at 639–40 (emphasis added); *see generally* Note, *The Right to Privacy of Prospective Jurors During Voir Dire,* 70 Cal.L.Rev. 708, 712–23 (1982); Comment, *Voir Dire Limitations as a Means of Protecting Juror's Safety and Privacy,* 93 Harv. L.Rev. 782, 782–92 (1980); Note, *The Defendant's Right to an Impartial Jury and the Rights of Prospective Jurors,* 48 U.Cin.L.R. 985, 985–98 (1979). The appropriate scope of *voir dire* will consequently depend upon the peculiar facts of particular cases. *Commonwealth v. DeHart,* 512 Pa.

235, 247, 516 A.2d 656, 662 (1986); *Commonwealth v. Richardson*, 504 Pa. 358, 362, 473 A.2d 1361, 1363 (1984).

■ While *voir dire* related to the discovery of grounds for challenges for cause will certainly aid counsel in exercising peremptory challenges, counsel is not entitled under Pennsylvania law to ask questions intended solely to aid the exercise of peremptory challenges. *Commonwealth v. England*, 474 Pa. 1, 6–7, 375 A.2d 1292, 1295 (1977); *Commonwealth v. Hathaway, supra,* 500 A.2d at 447; *Commonwealth v. DeMarco*, 332 Pa.Super. 315, 331, 481 A.2d 632, 640 (1984); *see also* Gaskins, "Jury Selection in Pennsylvania," in *How to Pick a Jury,* at 36 (PBI 1986).[3] Moreover, it is well settled that the scope and manner of *voir dire* is left to the sound discretion of the trial court, and the trial court's decisions relating to the scope of *voir dire* will only be reversed in exceptional cases when an abuse of that broad discretion occurs. *Commonwealth v. Abu–Jamal,* 521 Pa. 188, ——, 555 A.2d 846, 852 (1989); *Commonwealth v. Richardson, supra,* 504 Pa. at 362, 473 A.2d at 1363; *Commonwealth v. Drew, supra,* 500 Pa. at 589, 459 A.2d at 321; Pa.R.Crim.P. 1106(d).

Appellant contends that trial counsel erred in failing to seek more extensive individual *voir dire* designed to uncover possible bias based on the nature of the charges. The

---

**3.** There is considerable disagreement among attorneys, judges and commentators, as well as diversity in the law of the various common law jurisdictions, regarding the proper scope of *voir dire* as it relates to the exercise of peremptory challenges. *See* Annotation, *Right of Counsel in Criminal Case Personally to Conduct Voir Dire Examination of Prospective Jurors,* 73 A.L.R.2d 1187, 1195–98 (1960), 73–75 A.L. R.2d Supp. 40, 40–41 (1986 & 1988 Supp.) (noting the split of opinion as to whether defendants have a right to *voir dire* on matters addressed solely to the exercise of peremptory challenges); *cf.* East, *Jury Packing: A Thing of the Past,* 48 MLR 518, 519–20 (1985) (contrasting the restricted inquiries permitted under English law with "wide-open" *voir dire* permitted in American courts). Pennsylvania's policy of vesting the trial court with broad discretion to determine the appropriate scope of *voir dire* based upon the facts and circumstances of the particular case represents a middle grounds position which seeks to balance legitimate conflicting interests in the efficient administration of justice and the privacy of venire members, on one hand, with equally legitimate interests in the discovery and disclosure of grounds for challenges for cause on the other hand.

transcript of *voir dire* proceedings reveals that the following question by defense counsel was the only question related to such potential bias asked on *voir dire*:

The charges are rape, indecent assault, indecent exposure, and another count of indecent assault. Does anybody because of the nature of these offenses have an inability to serve as a member of this jury because they would be prejudiced against the Defendant by these charges?

(N.T. 8/5/85 at 10). At a post-verdict evidentiary hearing on appellant's claim of ineffective assistance of counsel following appellant's retention of new counsel for post-verdict proceedings and appeal, appellant's prior counsel testified that he felt that *voir dire* in this area was a delicate matter and that the question he asked during *voir dire* was adequate to elicit a response, if there had been any potential for prejudice in that regard. The trial court agreed, and we concur as well.

In support of his contention that *voir dire* was inadequate appellant notes the following: the estimated incidence of sexual abuse of females in America is as high as one in three women; men have also endured significant incidence of sexual abuse; and, the proportion of that abuse which goes unreported is also estimated to be quite high.[4] Appellant reasons from those facts that there is a significant likelihood that one or more of the members of a given

---

4. Appellant cites Mazur, *Understanding the Rape Victim: A Synthesis of Research Findings*, at 36 (1979) and Koss & Harvey, *The Rape Victim*, at 10 (1987). We note that thorough collections and analysis of the principle studies in this area may be found in Crewdson, *By Silence Betrayed*, at 24–33 (1988) and Warshaw, *I Never Called it Rape*, at 11–14 (1988). *See also* Attorney General's Family Violence Task Force, *Violence Against Children*, at 5–8 (Pa.1987) (discussing local and national child sexual abuse statistics). *But see* Besharov, "Unfounded Reports: The Newest Danger to Abused Children," *in* Spiegal, *A Question of Innocence: A True Story of False Accusation*, at 265–71 (1986) (noting that public awareness has also resulted in a dramatic increase in reports of sexual abuse deemed "unfounded" after investigation). With respect to the incidence of unreported sexual assault, see *Commonwealth v. Willis*, 380 Pa.Super. 555, 574 n. 5, 552 A.2d 682, 691 n. 5 (1988) (collecting authorities). *See also* Crewdson, *supra*; Warshaw, *supra*.

venire may have been the victim of some form of sexual abuse. This is a quite tenable suggestion. Indeed, it might also be noted that it is also likely that one or more perpetrators of some form of sexual abuse may also be members of the *venire*.

■ Appellant then collects various authorities for the general propositions that: people tend to minimize their prejudices; people tend to conform to perceived group norms; people are reluctant to disclose embarrassing or demeaning facts in front of large groups; highly offensive crimes like rape or incest tend to elicit emotional responses from victims of similar abuse;[5] direct specific questioning of a particular individual is more likely to result in the disclosure of embarrassing or demeaning facts than general group questioning.[6] On the basis of these propositions, appellant concludes that counsel's tactics on *voir dire* were unreasonable.

Though the avowed purpose of *voir dire* is to select an *impartial* jury, it can hardly be questioned that both defense and prosecution generally seek this end by attempting to identify anyone perceived to be likely to be *unfavorable*. The immediate goal for counsel during *voir dire* has gener-

5. While this will certainly be true in some cases, the mere fact that an individual or an individual's close friend or relative may have been victimized, sexually or otherwise, in a manner similar to that alleged in a case to be presented to such a juror does not alone warrant their exclusion for cause. Rather, the controlling question is whether the trial court, assessing the *venire* member's answers and demeanor, is or is not persuaded that the prospective juror will be able to set aside potential bias and render a true verdict solely on the evidence presented. *See Commonwealth v. Lane*, 521 Pa. 390, ——, 555 A.2d 1246, 1249 (1989).

6. Appellant's authority for this proposition is tenuous at best. He cites psychologists observations for the basic premise of reluctance to disclose, but shifts to articles by attorney advocates for expansive *voir dire* to support his particular conclusion that specific questions in individual *voir dire* were required. (Appellant's Brief at 12–24). We note particularly appellant's repeated reliance upon authorities discussing techniques to ensure elicitation of sufficient information to enable the "intelligent" or "effective" use of peremptory challenges. Such reliance is misplaced in that *voir dire* in Pennsylvania is simply not intended to permit inquires directed toward those broader and necessarily more invasive ends.

ally been the selection of a *favorable* rather than a *fair* jury. Moreover, it has long been assumed that the more information counsel had regarding the prospective jurors the more "effectively" counsel could exercise peremptory challenges to secure a *favorable* jury. The venerable trial advocate Clarence Darrow explained:

> Choosing jurors is always a delicate task. The more a lawyer knows of life, human nature, psychology, and the reactions of the human emotions, the better he is equipped for the subtle selection of his so-called 'twelve men, good and true.' *In this undertaking, everything, pertaining to the prospective juror needs to be questioned and weighed: his nationality, his business, religion, politics, social standing, family ties, friends, habits of life and thought; the books and newspapers he likes and reads, and many more matters that combine to make a man;* all of these qualities and experiences have left their effect on ideas, beliefs and fancies that inhabit his mind.

Darrow, "Attorney for the Defense: How to Pick a Jury," *Esquire Magazine* (May 1936), *reprinted in* Darrow, *Verdicts Out of Court,* at 311–24 (1963). (Emphasis added). Darrow found virtually every aspect of a juror's life relevant to the "intelligent" exercise of peremptory challenges and challenges for cause.

Jury selection techniques have "progressed" in recent years from reliance on the stereotype driven "conventional wisdom" of experienced members of the bar, to increased reliance upon the expert assistance of social scientists aided by computer analysis of "characteristic based statistical probabilities." *Compare* Darrow, *supra,* at 13–24 (providing stereotype driven jury selection pointers) *and* Schwartz & Fleming, *To Know Your Jurors, Know Their Community,* 1 Crim. Justice 21, 21–3 & 47–8 (1988) (discussing the use of sophisticated studies and surveys in jury selection); Roberts, *Is This a Case That Warrants a Jury and Trial Consultant,* 10 Trial Dipl.J. 15, 15–23 (1987) (same); Winston & Winston, *The Use of Sociological Techniques in the*

*Jury Selection Process,* 6 J.Crim.Def. 79, 79–97 (1980) (same).

Social scientists aided by computer analysis, manage to find meaning in facts even Clarence Darrow would have rejected as irrelevant. For example, a recent study suggested that significant statistical probabilities regarding jurors' views toward capital punishment could be gauged by such seemingly innocuous factors as how much television jurors watched, or how well they liked their neighbors. *See Winston & Winston, supra,* 6 J.Crim.Def. at 81.[7] *Voir dire* as intrusive and protracted as a social scientist aided by computer analysis might desire in order to assist counsel to "intelligently" exercise peremptory challenges and to "effectively" elicit disclosures "necessary" to make challenges for cause, would be likely to leave the venire without a stitch of privacy or a shred of dignity.

■ However, in Pennsylvania, neither the prosecution nor the defense have a "right" to *voir dire* on matters addressed solely to the "intelligent" or tactical use of peremptory challenges. *See Commonwealth v. England, supra; Commonwealth v. Hathaway, supra.* Rather, *voir dire* may properly be limited to questions *reasonably* designed to uncover bias or prejudice harbored by individual members of the venire.

Moreover, appellant's argument to the contrary notwithstanding, we find that *general* questioning regarding the potential of personal prejudices arising from the nature of the charges in cases involving sexual abuse in general, or

7. Though cloaked in the scientific garb of computer analysis, "characteristic based statistical probability" indicators for jury selection remain as conjectural as to *particular* members of the venire as the outdated "conventional wisdom" they have begun to replace. Neither tell us anything relevant to the disposition of a challenge to a particular member of a venire for cause.

We note that a statistically significant correlation between belief in the jury system and the likelihood of conviction has also been reported. *See* Sealy, *Another Look at Social Psychological Aspects of Juror Bias,* 5 Law & Hum.Behav. 187, 187–200 (1981). Such "bias" is hardly likely, though, to impress trial or appellate courts as a legitimate basis upon which to question or challenge prospective jurors.

intrafamilial sexual abuse in particular, has a strong tactical basis. Any member of this venire could have easily answered affirmatively to the general question asked by defense counsel on *voir dire* in this case, without any sense of shame or embarrassment, as no *personal* disclosure would necessarily be implied by such a response. If further examination was then deemed necessary to determine whether a valid basis for a challenge for cause actually existed, that examination could then have been made by the court, with counsel present, out of the view or hearing of the full venire. *See Press Enterprise Co. v. Superior Court, supra.* Thus, any shame or embarrassment experienced by the prospective juror could be effectively limited. In a group, and even in a more limited setting, members of a venire who have been victims of sexual abuse may be unwilling or unable to bring themselves to disclose the fact of their prior victimization by similar abuse. General questions, especially in an initial group *voir dire*, provide a degree of insulation which may permit disclosures otherwise not forthcoming. In that manner the likelihood of the disclosure of potential bias is enhanced.

Some members of a venire may never disclose their prejudices fully. For some, their own denial of the past events may be so strong as to prevent conscious awareness of the events, or of their potential prejudice. Whether the general questioning employed here, or the specific questioning appellant claims ought to have been employed, would actually have been more effective in eliciting disclosures from those who might eventually make disclosures of their potential prejudices is wholly a matter of conjecture at this late date.

Regardless of the precise balance struck between the merits of the different tactical approaches to *voir dire* discussed above, however, it is enough for us to say that the course chosen by trial counsel was reasonable. Like cross-examination, the conduct of *voir dire* is primarily a matter of individual style and highly subjective tactics; counsel's decisions regarding either will rarely give rise to a

legitimate claim of ineffective assistance. *Cf. Commonwealth v. Petras*, 368 Pa.Super. 372, 534 A.2d 483 (1987). No legitimate claim exists here.

## II. *Prosecutorial Misconduct*

Appellant contends that the prosecutor's closing argument was intemperate and highly animated and that it inflamed the juror's passions and prejudices. He concludes that the declaration of a mistrial was therefore required. Upon careful review of the transcript of both closing arguments, including the particular comments challenged by appellant, we find no merit in the contentions.

■ Appellant objects to the prosecutor's references to incest as "insidious," "evil," and "secret." The facts of this case, and the common opinion of decent society, fully sustain and justify those characterizations. While prosecutor's may not be permitted to use outrage at the type of crime committed as a substitute for the evidence of guilt necessary to convict, a prosecutor is nonetheless permitted, and even expected, to breath life with all its outrage, shame, and trauma, into otherwise sterile words like "rape" and "incest" during closing argument. To do otherwise would be to deny the full truth which those words imply, and to withhold from the jury a true image of the facts from the prosecution's perspective. Those references were not properly objectionable.

■ Appellant also objects to argument by the prosecution which suggested that conviction in this case would bring "the beginning of the end" of child sexual abuse in their county. This argument was improper. However, an immediate objection was sustained, and a clear, forceful and direct curative instruction was given by the trial court. We have no reason to doubt the trial court's estimation of the efficacy of its curative instruction.

■ Appellant also objects to argument by the prosecutor which suggested the prosecutor's personal beliefs, rather than his professional argument. This is a common error which counsel for both sides in hotly contested cases often

fall into in the heat of the argument. Such argument is unquestionably improper and objectionable. Again, however, an objection was made immediately, was sustained, and was followed by an appropriate curative instruction. Again, we have no reason to question the trial court's estimation of the efficacy of its curative instruction.

Viewed together, the prosecution and defense both pulled hard on the rein which the trial court held during closing arguments. Both sides were reined in when they began to go too far. We see no likelihood that the arguments stampeded the jury into verdict based on passion and prejudice rather than fact. Hence, we reject appellant's second contention. *See Commonwealth v. Howard,* 375 Pa.Super. 43, 543 A.2d 1169 (1988); *id.,* 375 Pa.Superior Ct. at 62–64, 543 A.2d at 1179–80 (Kelly, J., joining and concurring).

### III. *Juror Misconduct*

Appellant alleges two instances of juror misconduct which he claims require a new trial. We find no merit in the contentions.

First, appellant contends that, prior to deliberations, a juror met and questioned his daughter (not the victim) out of court. The daughter testified at a post-verdict evidentiary hearing that the juror had questioned her regarding the case. A second teenage girl partially corroborated this testimony by indicating that she had seen the juror talking with the daughter sometime during the general time period when the trial had occurred, but that she could not remember the date of the incident nor did she hear any part of the conversation. The juror in question testified and denied that any such contact had occurred. The trial judge sitting as finder of fact at the evidentiary hearing assessed the credibility of the witnesses and resolved the conflict in favor of the juror. Though the juror had been warned of the potential consequences of any self-incriminating evidence she might give, the judge was aware of that proper warning (U.S. Const.Amend. 5), and presumably considered its potential effect on the juror's candidness in assessing credibility. We find no basis to disturb the trial court's

finding that the alleged improper contact did not occur. *See Commonwealth v. Syre,* 513 Pa. 1, 518 A.2d 535 (1986).

The second allegation of juror misconduct was argued by appellant in support of his first contention of error and not set forth as a separate ground for relief. Nonetheless, in light of the unique and troubling context in which the claim arose, we find direct and separate discussion warranted.

■■■ It appears that during jury deliberations two friends of appellant "happened" to be loitering in the area outside the room where the jury was deliberating its verdict in this case and overheard a juror "exclaim," "I was rape by my father too, and this bastard isn't going to get away with it." Both reported the incident to trial counsel. After the verdict was entered, trial counsel employed a private investigator to interview the jurors to check-out the claim. The investigator discovered that the statement had been made, but that it had been made in the context of a dramatic demonstration by the juror in question to her fellow jurors of how a false claim could be convincingly asserted. At the post-verdict evidentiary hearing the trial attorney indicated that he found no basis to pursue the matter further. The trial court agreed, and we concur.

The foregoing incident demonstrates, however, the need to ensure the privacy of juror deliberations, and the harm which can arise from permitting casual eavesdropping or even incidental access to the immediate area where such deliberations are conducted.[8] An isolated comment taken out of context spawned a private investigation and has been suggested as a basis to impeach a jury's verdict. As it turns out, the comment did not have the import first suspected, and in no way suggests that the juror answered falsely on *voir dire,* or that the verdict was otherwise compromised. It is hoped, however, that notice of this regrettable intrusion upon the privacy of jury deliberations

---

**8.** We note that it is a third degree misdemeanor to intentionally listen, by any manner, to the private deliberations of a jury. *See* 18 Pa.C.S.A. § 5103; *accord* 18 U.S.C.A. § 1508.

will engender renewed vigilance in preventing such intrusions in the future.

## Conclusion

Based upon the foregoing judgment of sentence is affirmed.

MONTEMURO, J., concurs in the result.