567 A.2d 724

**COMMONWEALTH of Pennsylvania**

v.

**Derrick GIBSON, Appellant.**

Superior Court of Pennsylvania.

Argued June 28, 1989.

Filed Dec. 22, 1989.

Helen Marino, Asst. Public Defender, Philadelphia, for appellant.

JoAnn Verrier, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before TAMILIA, KELLY and HESTER, JJ.

KELLY, Judge:

Appellant, Derrick Gibson, appeals from judgment of sentence imposed following his jury trial conviction of robbery. Appellant seeks discharge or a new trial based upon his contentions that: his rights to due process and equal protection were denied by his inclusion in a career criminal program; his right to an impartial jury was denied by the trial court's restriction of the scope of *voir dire;* he was prejudiced by improper references to police photographs; he was prejudiced by inaccurate and incomplete jury instructions; and, he was prejudiced by prosecutorial misconduct in the prosecution's closing argument. We find no merit in the contentions and affirm judgment of sentence imposed by the trial court.

## FACTS AND PROCEDURAL HISTORY

On September 24, 1985, Mrs. Ruth Flounders went to visit her friend, Mr. Frank Keisler. At about 11:00 p.m., she decided to go home. Mr. Keisler offered to walk her home to make sure she reached her home, a few blocks away on Forty Third Street in Philadelphia, safely.

The entry to Mrs. Flounders' home has an outside door, a foyer, and an inside door. After Mrs. Flounders opened the outside door, but before she entered the inside door, appellant appeared and pushed himself and Mrs. Flounders into the foyer and demanded money. Mr. Keisler had already entered the foyer. Appellant had his hand covered by a towel. Both Mrs. Flounders and Mr. Keisler believed appellant had a gun under the towel. While appellant was distracted by Mr. Keisler, Mrs. Flounders was able to flee into the house. Appellant then rummaged through Mr. Keisler's pockets with the hand which was not covered by the towel. Mr. Keisler took advantage of this opportunity, shoved appellant, and managed to escape into the house. Appellant broke the lead glass panels of the inside door attempting to gain entry, but fled the scene when Mr. Flounders yelled out as he joined his wife and Mr. Keisler at the inside door to help repel appellant's efforts to enter the house.

Both Mrs. Flounders and Mr. Keisler gave descriptions of appellant to the police shortly after the incident. Mr. Keisler was able to identify appellant from among several hundred police photographs. He later identified appellant again from a separate photo array. Mrs. Flounders indicated that she could not make a positive identification from the police photographs. Prior to the preliminary hearing, at defense request a line-up identification procedure was conducted using other young men with similar characteristics selected to be in the line-up by defense counsel. Both Mrs. Flounders and Mr. Keisler, separately, positively identified appellant as their attacker.

On November 18, 1987, following a two day jury trial, appellant was found guilty of robbery. Post-verdict motions were filed, argued, and denied. On January 11, 1988, appellant was sentenced to a one and one-half (1½) to ten (10) year term of imprisonment. Timely notice of appeal was filed.

## I. CAREER CRIMINAL PROGRAM

Appellant first contends, generally, that he was denied due process and equal protection of the laws by the inclusion of his case in Philadelphia's Career Criminal Program. In addition to his general challenge to the program, appellant contends specifically that the program improperly interfered with his right to a non-jury trial pursuant to Pa.R.Crim.P. 1101, and that the Commonwealth failed to establish that his case was appropriate for inclusion in the program.

## A. GENERAL CHALLENGE

Appellant's general challenge to career criminal programs is vague and conclusory. He argues that programs such as Philadelphia's, which involve not only the special allocation of prosecutorial resources but also the designation of certain common pleas court judges to hear career criminal cases, "should have no place in the administration of criminal justice." (Appellant's Brief at 61). We find no reason to reconsider, as appellant requests, the numerous prior decisions of this Court rejecting various constitutional challenges to Philadelphia's Career Criminal Program. *See Commonwealth v. Barnes*, 388 Pa.Super. 327, 565 A.2d 777 (1989); *Commonwealth v. Simmons*, 388 Pa.Super. 271, 565 A.2d 481 (1989); *Commonwealth v. Vinson*, 361 Pa.Super. 526, 522 A.2d 1155 (1987); *Commonwealth v. Stinnett*, 356 Pa.Super. 83, 514 A.2d 154 (1986); *Commonwealth v. Carter*, 347 Pa.Super. 624, 501 A.2d 250 (1985), *allocatur denied* 517 Pa. 591, 535 A.2d 81 (1987); *Commonwealth v. Kellum*, 339 Pa.Super. 513, 489 A.2d 758

(1985); *Commonwealth v. Hailey,* 332 Pa.Super. 167, 480 A.2d 1240 (1984).

## B. *Pa.R.Crim.P. 1101*

Appellant also contends more specifically that the assignments of his case to the career criminal program infringed upon his "right" to a non-jury trial pursuant to Pa.R.Crim.P. 1101. Appellant cites *Commonwealth v. Goodman,* 454 Pa. 358, 311 A.2d 652 (1973) and *Commonwealth v. Jones,* 259 Pa.Super. 103, 393 A.2d 737 (1978), in support of his argument that recusal *must* be granted if the trial judge becomes aware of inadmissible evidence of prior convictions or other seriously prejudicial evidence during pre-trial proceedings. Appellant concludes that assignment of career criminal cases to particular judges improperly infringes upon his qualified right to a non-jury trial pursuant to Pa.R.Crim.P. 1101 as set forth in *Commonwealth v. Sorrell,* 500 Pa. 355, 456 A.2d 1326 (1982), by making him choose between a jury trial and a bench trial before a judge tainted with knowledge of his prior record *via* the fact of his inclusion in the career criminal program.[1]

This contention has been fully addressed and unequivocally rejected previously. *See Commonwealth v. Simmons, supra,* 565 A.2d at 483; *Commonwealth v. Stinnett, supra,* 514 A.2d at 161; *Commonwealth v. Carter, supra,* 501 A.2d at 252–53; *Commonwealth v. Kellum, supra,* 489 A.2d at 759–61 & nn. 1–3; *Commonwealth v. Hailey, supra,* 480 A.2d at 1243. The only possible distinction between those cases and this, is that here appellant's entire

---

1. Though appellant emphasizes the fact that career criminal program cases were, at the time of this case, assigned to three specially designated judges, a trial judge's general awareness of the fact of a serious but unspecified criminal record based upon the judge's knowledge that the case was assigned to the career criminal program might arise even in absence of such special assignments, as the appearance of prosecutors specially assigned to the program might arguably convey the same information to at least some of the judges before whom the prosecutor appears. The discussion of the general awareness arising from the assignment of the case to specially designated judges thus applies as well to whatever general awareness might arise from the appearance of a specially designated career criminal prosecutor before non-designated judges.

prior criminal record consisted of juvenile delinquency adjudications which ordinarily could not be used for impeachment purposes at trial. *See Commonwealth v. Case*, 322 Pa.Super. 24, 469 A.2d 162 (1983), *aff'd* 513 Pa. 299, 520 A.2d 1373 (1987) (*per curiam*). This factual distinction does not compel a different result.

A party seeking recusal of the trial judge bears the burden of establishing the grounds for recusal. *Commonwealth v. Reddix*, 355 Pa.Super. 514, 522, 513 A.2d 1041, 1044 (1986). Participation of the trial judge in an earlier stage of proceedings or in a separate matter involving the same defendant does not, by itself, establish grounds for recusal. *Commonwealth v. Sirbaugh*, 347 Pa.Super. 154, 167, 500 A.2d 453, 459 (1985). Even the fact that the trial judge may have been made aware of improper evidence does not require recusal; because, a trial judge is presumed to be capable of disregarding improper evidence, including evidence of prior criminal acts. *Commonwealth v. Davis*, 491 Pa. 363, 371–72, 421 A.2d 179, 183 (1980); *Commonwealth v. Stinnett, supra*, 514 A.2d at 161; *Commonwealth v. Carter, supra*, 501 A.2d at 252–53. It is only when the evidence brought to the attention of the trial court is both inadmissible and highly prejudicial that recusal may be required. *Commonwealth v. Lewis*, 314 Pa.Super. 298, 303–04, 460 A.2d 1149, 1151–52 (1983).

This Court has held on several occasions that, absent exceptional circumstances, a trial court must grant a recusal motion following the withdrawal of a guilty plea. *Commonwealth v. Simmons*, 335 Pa.Super. 57, 483 A.2d 953 (1984) (collecting cases); *Commonwealth v. Casella*, 312 Pa.Super. 375, 458 A.2d 1007 (1983) (illustrating exceptional circumstances). Similarly, this Court held in *Commonwealth v. Jones, supra,* that a new trial was required based upon the *specific prejudice* arising from particular inferences which the trial court expressly drew from inadmissible prior conviction evidence considered by the trial court. 393 A.2d at 740. However, broader statements in *Goodman* and *Jones,* suggesting the desirability or propriety of

recusal in cases not involving a risk of specific prejudice, are plainly *dicta* which has not been followed in subsequent cases where the issue was squarely presented. *See Commonwealth v. Davis, supra; Commonwealth v. Stinnett, supra.* Thus, despite reservations regarding the potential for prejudice in circumstances like those presented in *Simmons* and *Jones,* there is still a strong presumption that a trial judge will ordinarily be capable of ignoring inadmissible evidence. *See generally Commonwealth v. Batty,* 482 Pa. 173, 178, 393 A.2d 435, 438 (1978) (explaining the rationale for this presumption).

Moreover, in *Commonwealth v. Sorrell, supra,* our Supreme Court affirmed, as being within the sound discretion of the trial court, the trial court's decision to deny defendant Smith's motion for a non-jury trial based upon the fact that the trial court doubted its own impartiality following its exposure to the defendant's prior record during pre-trial proceedings. 456 A.2d at 1329. If, as appellant argues, Pa.R.Crim.P. 1101 was intended to confer a right to a non-jury trial before a trial judge free from any possible taint arising from knowledge of the defendant's prior record, then the appropriate course would have been for the trial court to recuse itself rather than to deny the motion for a non-jury trial. Our Supreme Court's approval of the denial of the motion for a non-jury trial under those circumstances exposes the fundamental flaw in appellant's contention. Succinctly, there was no "right" to a non-jury trial with which the career criminal program could improperly interfere. *See Commonwealth v. Hailey, supra,* 480 A.2d at 1242–43.

## C. SELECTION CRITERIA

 Finally, appellant contends that even if the program itself is constitutional, the assignment of his case to the program was not, as the prosecution failed to establish that his case properly fell within the program selection criteria. Appellant cites *Commonwealth v. Sorrell, supra,* and *Commonwealth v. Carter, supra,* in support of his

argument that the Commonwealth is required to disclose the specific selection criteria applicable to the program and must establish that the case meets those criteria whenever a defendant challenges the assignment of his or her case to the program. We cannot agree.

Initially, we note and reemphasize this Court's previous declaration that an accused "has no substantive right in the less aggressive prosecutorial effort which is commonly afforded criminal defendants not prosecuted under career criminal programs." *Commonwealth v. Stinnett, supra,* 514 A.2d at 160. Appellants prosecuted under the program retain the right to be heard by themselves and counsel, to demand the nature and cause of the accusation against them, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in their favor, to have a speedy public trial by an impartial jury of their peers. They cannot be compelled to give evidence against themselves, nor can they be deprived of life, liberty or property, unless by the judgment of their peers or the law of the land. Pa. Const.Art. 1, sec. 9. None of these rights are in the least encroached upon by career criminal programs, nor has appellant asserted any such encroachment. Indeed, by reducing unnecessary continuances and ensuring accelerated and enhanced prosecutorial preparation, the assignment of a case to the career criminal program provides added protection to the accused's speedy trial right, which crowded dockets and logistical difficulties often deny other criminal cases. Rather, appellant's constitutional challenge sounds solely under *equal protection* grounds, and presents no substantive or procedural due process challenge.

Appellant's criminal record speaks for itself. On June 24, 1983, appellant was adjudicated delinquent on charges of burglary, criminal trespass and conspiracy. In November 1983, appellant was adjudicated delinquent on charges of burglary, theft, criminal trespass and conspiracy. In both instances he received probation. On October 26, 1984, appellant was adjudicated delinquent on charges of robbery, aggravated assault, reckless endangerment, terroristic

threats and conspiracy. He was then referred to the juvenile facility at Glen Mills. On March 26, 1985, appellant was adjudicated delinquent on charges of robbery, aggravated assault, theft, and terroristic threats. He was again referred to the Glen Mills facility. Twenty-eight days after his release from the Glen Mills facility, appellant committed the instant armed robbery offense. Thus, in the two year period preceding this offense, appellant was adjudicated delinquent on charges involving serious criminal offenses four times. Despite appellant's claim at sentencing that he had been "railroaded," and his incredible assertion that despite his juvenile record he was "a typical teenager" (N.T. 1/11/88 at 46–47), there can be little doubt that the label "career criminal" aptly fits appellant, notwithstanding his youth.[2]

In *Commonwealth v. Sorrell, supra,* our Supreme Court contrasted Pa.R.Crim.P. 1101 and its provision for an impartial judicial determination as to whether a non-jury trial should be permitted, with 42 Pa.C.S.A. § 5104(c) which vested discretion in the prosecution as to whether a non-jury trial would be permitted without any provision for accountability, *i.e.* without requiring disclosure of the reasons for denial on the record. 456 A.2d at 1329. This comparison was intended to demonstrate our Supreme Court's reason for promulgating a procedural rule which denied prosecutors the equivalent of a veto power over non-jury trials which 42 Pa.C.S.A. § 5104(c) purported to convey.

In *Commonwealth v. Carter, supra,* a panel of this Court expressed its belief that "the policy of *Sorrell* mandates that the District Attorney be *accountable* in administering this [career criminal] program." 501 A.2d at 253. (Emphasis in original). The panel further stated:

Although appellant has not argued this issue on appeal, inherent in our holding is the requirement that *the prosecutor exercise good faith in assigning to the program*

2. At the time of sentencing, additional charges were pending against appellant in two unrelated cases.

*only those defendants who truly fit the criteria for inclusion, and that the criteria be reasonably adapted to effectuate the stated policy of more effectively prosecuting recidivists.* It is imperative that the District Attorney not be permitted to administer this program capriciously, lest *Sorrell's* policy against prosecutorial unaccountability be undermined.

501 A.2d at 253–54. (Emphasis added). Though plainly *dicta,* we agree that the constitutional mandates of due process and equal protection preclude capricious or discriminatory administration of the career criminal program. However, we find no basis for appellant's assertion that accountability interests discussed in *Sorrell* and *Carter* require that we impose a burden of proof upon the prosecution to establish that appellant's inclusion in the program was *not* capricious or discriminatory whenever a defendant challenges the inclusion of his or her case in the program. *Cf. Commonwealth v. Simmons, supra,* 565 A.2d at 486–487. (Beck, J., concurring).

Ordinarily, a party challenging prosecutorial conduct as capricious or discriminatory bears the burden of establishing the capricious or discriminatory nature of the act challenged. *See Commonwealth v. Covert,* 322 Pa.Super. 192, 469 A.2d 248 (1983). In cases where the discretionary or confidential nature of the act challenged has prevented direct proof of the alleged capricious or discriminatory nature of the act, a preliminary showing establishing a likelihood that the act may have been capricious or discriminatory has been required before the prosecution was required to provide a justification for its action on the record. *See e.g. Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (alleged discriminatory use of peremptory challenges); *Texas v. McCullough,* 475 U.S. 134, 106 S.Ct. 976, 89 L.Ed.2d 104 (1986) (alleged prosecutorial vindictiveness); *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (alleged impropriety regarding use of confidential informants to support warrant applications); *see also Commonwealth v. Hardcastle,* 519 Pa. 236, 546

A.2d 1101 (1988); *Commonwealth v. Miller*, 513 Pa. 118, 518 A.2d 1187 (1986); *Commonwealth v. Rocco*, 375 Pa.Super. 330, 544 A.2d 496 (1988). When the preliminary showing is made, a response must be made in rebuttal; nonetheless, when a response is made, the ultimate and dispositive question remains whether caprice or discrimination was established, and the burden of persuasion rests on the party asserting misconduct. *See Batson v. Kentucky*, 476 U.S. at 98 & nn. 20–21, 106 S.Ct. at 1724 & nn. 20–21, 90 L.Ed.2d at 88–89 & nn. 20–21; *cf. Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–58, 101 S.Ct. 1089, 1091–1097, 67 L.Ed.2d 207, 215–17 (1981); *Allegheny Housing Rehabilitation Corporation v. Commonwealth, Human Relations Commission*, 516 Pa. 124, 129–31, 532 A.2d 315, 317–18 (1987).

Here, appellant contends that his conviction must be reversed because the Commonwealth failed to prove that the inclusion of his case in the career criminal program was *not* unconstitutional. We reject appellant's allocation of a burden of production and the ultimate burden of proof on the Commonwealth. Rather, appellant's claim must fail as appellant has failed to establish even a preliminary showing that the inclusion of his case in the program was likely to have been capricious or discriminatory, and therefore unconstitutional. To the contrary, the record plainly reveals that the assignment of appellant's case to the career criminal program was neither capricious nor discriminatory.

Appellant argues specifically that because his delinquency adjudications did not meet the assignment criteria last publically announced for the Philadelphia Career Criminal Program in 1983, the inclusion of his case in the program must be deemed capricious. This contention rests upon two erroneous assumptions, *i.e.* that the selection criteria could only be altered by a publicly announced revision to the program, and that the selection criteria must be narrowly construed. We reject both of those assumptions.

The career criminal program model designed by the Law Enforcement Assistance Administration (and adopted in

Philadelphia) [3] was designed to meet different needs in different communities through (among other things) variation in the selection criteria. *See generally* Gay, *Targeting Law Enforcement Resources: The Career Criminal Focus,* at 25–30 (U.S.Dept.Just., NIJ 1985) (discussing policy and administrative aspects of the choice of selection criteria); Williams, *Selection Criteria for Career Criminal Programs,* 71 J.Crim.L. & Crim. 89, 89–93 (1980) (discussing the "crime reduction through incapacitation" aspects of developing appropriate selection criteria); *see also The National Directory of Career Criminal Programs, passim* (INSLAW 1980) (listing career criminal programs known to be operating in 1980 and their selection criteria, demonstrating the variability of selection criteria used).

Similarly, changing needs within a community were to be accomodated by modification of the selection criteria as the program evolved. *See* Gay, *supra* at 27–30 (noting changes in selection criteria in New York and Maryland programs as those programs developed). Peter Greenwood of the Rand Corporation explained succinctly, "... as time passes, the career criminal concept will continue to evolve. Selection criteria will be modified, and new procedures will be tested." Greenwood, *Career Criminal Prosecution,* 71 J.Crim.L. & Crim. 85, 88 (1980). Adjustment to the selection criteria was to be based upon general research relating to the career criminal program model and continuous collection and analysis of program and local crime statistics. *Memorandum, supra* at n. 2 (stating the selection criteria *as revised* in 1983); *Concept Paper, supra* at n. 2, at 4–5 (the original model specifically envisioned such revisions and provided for a Joint Crime Analysis Team to make reports and offer recommendations to the program's Coordination and Management Team regarding such revisions); *see also Career Criminal Briefing Paper No. 4: Monitoring and Evaluation, passim* (LEAA undated, post 1978)

**3.** *See generally Memorandum: Selection Criteria Revisions* (Phila.D.A. 1983); *Report and Evaluation: Philadelphia Career Criminal Program* (Citizens Crime Comm.1980); *Concept Paper for a Comprehensive Career Criminal Program in Philadelphia* (Phila.D.A.1978).

(discussing the importance of monitoring, evaluation, and revision generally).

While public disclosure of any changes in the selection criteria might help allay any suspicions of capricious or discriminatory administration of the program, we find no constitutional mandate for such candor by the district attorney regarding his *policy* decisions. *Cf. Commonwealth v. Simmons, supra* (Beck, J., concurring). Rather, justification for the assignment of a particular case to the career criminal program is only *constitutionally* required when the defendant has made a preliminary showing that there is a likelihood that the assignment was capricious or discriminatory. *See Batson v. Kentucky, supra; Texas v. McCullough, supra; Franks v. Delaware, supra.*

Moreover, though the precise terms of the career criminal program as currently administered by the Philadelphia District Attorney's Office are not set forth in the record, it is readily apparent that juvenile delinquency adjudications are considered *among other factors* in determining whether assignment criteria are met. The Commonwealth's brief to this Court clearly indicates that it is the policy of the Philadelphia District Attorney to consider prior juvenile delinquency adjudications as well as prior convictions in deciding whether to assign a particular case to the career criminal unit. (Commonwealth Brief at 21–22). *It is important to note in this respect that appellant does not argue that his prior delinquency adjudications were treated differently than those of other defendants,* rather he complains that the district attorney has violated his constitutional rights by considering juvenile delinquency adjudications at all. Moreover, *we find no indication, whatsoever, in the record that appellant's juvenile record was treated differently than the juvenile records of similarly situated defendants.*[4]

---

4. In the brief to this Court, appellant states:
 > Here, appellant had no prior convictions. His "record" consists only of juvenile adjudications, which are not understood under the law to be convictions. Yet the only written guidelines available to

There is no reason why the Philadelphia District Attorney could not include prior juvenile delinquency adjudications among his career criminal program selection criteria. In *Commonwealth v. Ebert*, 369 Pa.Super. 318, 535 A.2d 178 (1987), this Court held that a district attorney may properly consider juvenile delinquency adjudications in exercising his or her discretion to grant or deny ARD. Similarly, in *Commonwealth v. Woodward*, 368 Pa.Super. 363, 534 A.2d 478 (1987), this Court held that juvenile delinquency adjudications may properly be considered in determining the convict's prior record score under the sentencing guidelines. *Cf. Commonwealth v. Darden*, 366 Pa.Super. 597, 531 A.2d 1144 (1987) (juvenile delinquency adjudications may properly be considered as aggravating factors at sentencing when they are not otherwise incorporated in the sentencing guidelines prior record score provisions). We can see no reason, then, why the prior juvenile delinquency adjudications could not be considered in deciding whether to assign a case to the career criminal program.

Indeed, consideration of prior juvenile delinquency adjudications may greatly enhance the crime prevention effects of the selective incapacitation which the career criminal program is intended to produce. Studies have indicated that younger criminals commit crimes more frequently than

the defense, contained in a January 1983 memorandum from the prosecutor's office, made no reference to juvenile adjudications as satisfying the "recidivist" requirement of the CCP. The memo referred only to "convictions." *The prosecutor did not contest or deny the continued validity of those guidelines (which were submitted as part of the defense's motion), and did not suggest that any change in policy had been made that would include prior juvenile adjudication.*
(Appellant's Brief at 68). (Emphasis added). Appellant overstates his case. Review of the record of the pre-trial hearing reveals that the trial judge, who as a specially assigned career criminal program judge was well aware of the program operations and the previous unsuccessful challenges to the program, denied counsel's multi-prong challenge without requesting or even permitting response by the Commonwealth. (N.T. 11/16/87 at 2–6). Appellant's suggestion on appeal that the Commonwealth conceded the continued applicability of the 1983 selection criteria or appellants narrow construction of those criteria is simply not supported by the record.

older criminals.[5] In evaluating the original career criminal program model, commentators noted that by requiring multiple prior adult felony convictions, the program targeted career criminals who were already statistically likely to be committing crimes less frequently than the younger career criminals who had not yet been convicted of the requisite number of designated felonies.[6] Commentators specifically recommended that this "defect" in the career criminal program model be cured by including prior juvenile delinquency adjudications among the selection criteria.[7] From the record in this case it appears that the Philadelphia District Attorney's Office has embraced this recommendation and has adjusted case assignment policies accordingly.[8]

5. *See* Kramer, *At a Tender Age,* at 8–20 (1988); Greenwood, *Selective Incapacitation,* at 102–03 (U.S.Dept.Just., NIJ 1982) (Greenwood); Williams, *supra,* 71 J.Crim.L. & Crim. at 93; Boland, *Fighting Crime: The Problem of Adolescents,* 71 J.Crim.L. & Crim. 94, 94–97 (1980); Peterson & Braiker, *Doing Crime* (U.S.Dept.Just., NIJ 1980); Vane Dine, Conrad & Dinitz, *The Incapacitation of the Chronic Thug,* 70 J.Crim.L. & Crim. 125, 125–34 (1979) (reporting study results but disputing the policy implications); Petersilia, Greenwood & Lavin, *Criminal Careers of Habitual Felons,* at 106, 148–49 (1978); Boland & Wilson, *Age, Crime & Punishment,* 51 Pub.Interest 22 (1978); *see also* Strasburg, "Recent National Trends in Serious Juvenile Crime," *in Violent Juvenile Offenders,* at 5–30 (Mathias, DeMuro & Allinson, *eds.,* N.C.C.D.1984) (analyzing juvenile crime statistics generally); Wolfgang, "Crime in a Birth Cohort," in *Crime & Justice Annual,* at 112 (Aldine, *ed.,* 1973); Wolfgang, Figlio & Sellin, *Delinquency in a Birth Cohort, passim* (1972).

6. *See* Greenwood, *supra* at n. 5, at 98 (prior felony convictions were not found to be a good predictor of "high rate" recidivism); Williams, *supra,* 71 J.Crim.L. & Crim. at 92 ("By the time a person is old enough to have several prior convictions, he is old enough to have reduced his propensity toward crime."); Boland, *supra,* 71 J.Crim.L. & Crim. at 94 (focusing on prior felony convictions "will not result in the incarceration of the most active offenders"—juveniles and young adults); *accord* Taylor, *DA's Special Teams Win Stiffer Sentences for 'Career Criminals': But Do They Crack Down on Worn–Out Offenders Instead of Active Ones?,* Wall Street Journal, p. 1, col. 1 (May 11, 1982).

7. Williams, *supra,* 71 J.Crim.L. & Crim. at 93; Boland, *supra,* 71 J.Crim.L. & Crim. at 97.

8. In a related development, the Office of Juvenile Justice and Delinquency Prevention of the Federal Department of Justice has recently completed a two-year study of a juvenile career criminal program known as the Habitual Serious and Violent Juvenile Offender Program which was modeled on the LEAA's adult career criminal program. The pilot program was considered successful, and was recommended for use in medium to large sized urban jurisdictions. *See*

It is not clear from this record whether a formal revision of the selection criteria was made or whether existing criteria were merely construed liberally to include adjudications as well as convictions. Regardless, we are of the opinion that appellant's four juvenile delinquency adjudications criminal offenses involving burglary and/or robbery within two years of the current armed robbery offense could reasonably be considered the *substantial equivalent* of two robbery convictions (the assignment threshhold under the 1983 guidelines) for the purpose of the initial case selection screening procedures. We see no reason why the district attorney's office could not liberally construe its own guidelines to effectuate the purposes of its own program. Appellant's reliance upon the presumptive difference between the terms "conviction" and "adjudication" when used in *legislative* enactments (*see Commonwealth v. Case, supra*) is misplaced. We deal here with the question of whether an executive authority has reasonably applied general guidelines promulgated by the executive authority itself to govern the exercise of its legitimate discretionary authority, and not with a question of statutory construction. Moreover, the program model adopted in Philadelphia specifically envisioned "sufficient flexibility" to permit the Career Criminal Unit to reject some cases that met the strict selection criteria, and accept some cases which did not meet the strict selection criteria. *See Concept Paper, supra* at n. 2, at 8.[9]

Speirs, *Targeting Serious Juvenile Offenders for Prosecution Can Make a Difference,* No. 211 N.I.J.Rept. 9, 9–12 (Sept.–Oct.1988). Ironically, the study reports that public defenders criticized the various selection criteria of the thirteen separate pilot program units as *too rigid* and indicated that "they would have preferred a *more flexible selection process.*" Speirs, *supra,* at 11.

**9.** *See generally Career Criminal Program Briefing Paper No. 7: Selection Criteria, supra* (generally discussing factors in addition to prior record selection criteria which affect assignment to the program). We note, for example, that only 28% or 1,179 of the 4,238 cases which met the prior record selection criteria of the New York career criminal unit in 1982 were ultimately assigned to the unit for augmented prosecution. Gay, *supra,* at 29. Reasons for not assigning to the unit cases which met the threshold selection criteria included the relatively minor nature of the current offense, evidentiary weaknesses including

While general *internal* guidelines may be appropriate to prevent capricious or discriminatory exercises of prosecutorial discretion in assigning cases to career criminal programs, broad prosecutorial discretion must *necessarily* remain. Consequently, we reject appellant's request that we strictly construe the Philadelphia District Attorney's career criminal program case assignment selection criteria. *The due process and equal protection clauses proscribe capricious or discriminatory exercises of prosecutorial discretion; they do not command rigidity.*

In summary, we find no reason to doubt that the current selection criteria of Philadelphia's Career Criminal Program were applied in good faith, and the criteria themselves have been appropriately adapted to effectuate the stated policy of the program. *Cf. Commonwealth v. Carter, supra.* Hence, appellant's constitutional challenge to the inclusion of his case in the career criminal program based upon alleged capriciousness is found to be without merit.

## II. VOIR DIRE

Appellant next contends that the trial court denied him a fair and impartial jury by unduly restricting *voir dire.* Specifically, appellant argues that the trial court abused its discretion in refusing to question the venire as to whether they or close family or friends had been victims of violent crime rather than robbery only, and whether any member of the venire had previously served on a jury. We find no merit in the contentions.

The sole legitimate purpose of *voir dire* is to ensure selection of a competent, fair, and impartial jury. *Commonwealth v. Drew*, 500 Pa. 585, 588–89, 459 A.2d 318, 320 (1983); *Commonwealth v. Hathaway*, 347 Pa.Super. 134, 142–43, 500 A.2d 443, 447 (1985); *Commonwealth v. Slocum*, 384 Pa.Super. 428, 432, 559 A.2d 50, 52 (1989). While the trial court must provide reasonable latitude for counsel to discover and expose grounds to challenge members of

reluctant witnesses and relationships between the accused and the alleged victim, and conflicts with pending investigations. *Id.*

the venire for cause, the court must also consider the countervailing privacy interests of the members of the venire. *See Commonwealth v. Slocum, supra; see generally* Note, *The Right to Privacy of Prospective Jurors During Voir Dire,* 70 Cal.L.Rev. 708, 712–23 (1982); Comment, *Voir Dire Limitations as a Means of Protecting Juror's Safety and Privacy,* 93 Harv.L.Rev. 782, 782–92 (1980); Note, *The Defendant's Right to an Impartial Jury and the Rights of Prospective Jurors,* 48 U.Cinn.L.R. 985, 985–98 (1979). The appropriate scope of *voir dire* will consequently depend upon the peculiar facts of particular cases. *Commonwealth v. DeHart,* 512 Pa. 235, 247, 516 A.2d 656, 662 (1986); *Commonwealth v. Richardson,* 504 Pa. 358, 362, 473 A.2d 1361, 1363 (1984); *Commonwealth v. Slocum, supra,* 559 A.2d at 53.

■ While *voir dire* related to the discovery of grounds for challenges for cause will certainly aid counsel in exercising peremptory challenges, counsel is not entitled under Pennsylvania law to ask questions intended solely to aid the exercise of peremptory challenges. *Commonwealth v. England,* 474 Pa. 1, 6–7, 375 A.2d 1292, 1295 (1977); *Commonwealth v. Slocum, supra,* 559 A.2d at 53; *Commonwealth v. Hathaway, supra,* 500 A.2d at 447; *Commonwealth v. DeMarco,* 332 Pa.Super. 315, 331, 481 A.2d 632, 640 (1984); *see also* Gaskins, "Jury Selection in Pennsylvania," in *How to Pick a Jury,* at 36 (PBI 1986).[10] Moreover,

10. There is considerable disagreement among attorneys, judges and commentators, as well as diversity in the law of the various common law jurisdictions, regarding the proper scope of *voir dire* as it relates to the exercise of peremptory challenges. *See* Annotation, *Right of Counsel in Criminal Case Personally to Conduct Voir Dire Examination of Prospective Jurors,* 73 A.L.R.2d 1187, 1195–98 (1960), 73–75 A.L.R.2d Supp. 40, 40–41 (1986 & 1988 Supp.) (noting the split of opinion as to whether defendants have a right to *voir dire* on matters addressed solely to the exercise of peremptory challenges); *cf.* East, *Jury Packing: A Thing of the Past,* 48 MLR 518, 519–20 (1985) (contrasting the restricted inquiries permitted under English law with "wide-open" *voir dire* permitted in American courts). Pennsylvania's policy of vesting the trial court with broad discretion to determine the appropriate scope of *voir dire* based upon the facts and circumstances of the particular case represents a middle ground position which seeks to balance legitimate conflicting interests in the efficient administration

it is well settled that the scope and manner of *voir dire* is left to the sound discretion of the trial court, and the trial court's decisions relating to the scope of *voir dire* will only be reversed in exceptional cases when an abuse of that broad discretion occurs. *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 200, 555 A.2d 846, 852 (1989); *Commonwealth v. Richardson, supra,* 473 A.2d at 1363; *Commonwealth v. Drew, supra,* 459 A.2d at 321; *Commonwealth v. Slocum, supra,* 559 A.2d at 53; Pa.R.Crim.P. 1106(d).

In the instant case, *voir dire* was conducted entirely by the trial judge. Prior to commencement of *voir dire,* counsel were given an opportunity to suggest questions to be asked during *voir dire.* (N.T. 11/17/87 at 11–13). Though defense counsel did suggest some questions, counsel did not specifically request any questions regarding whether members of the venire or close family members had been the victim of a violent crime or whether members of the venire had prior jury service. After indicating which of the suggested questions he would ask, the trial court commenced its *voir dire,* which included a question as to whether any of the members of the venire or close family members had been the victim of a robbery. Seven members of the venire responded affirmatively; four were excused when they expressed doubts as to their ability to render a fair verdict in a robbery case based upon their prior experiences. (N.T. 11/17/87 at 16–21). The other three indicated that they believed they could render a fair verdict despite their prior experiences; and so, they were permitted to remain on the venire. *Cf. Commonwealth v. Lane,* 521 Pa. 390, 394, 555 A.2d 1246, 1249 (1989); *Commonwealth v. DeHart, supra,* 516 A.2d at 663; *Commonwealth v. Slocum, supra,* 559 A.2d at 54 n. 5.

of justice and the privacy of venire members, on one hand, with equally legitimate interests in the discovery and disclosure of grounds for challenges for cause and the effective use of peremptory challenges to remove those whose impartiality might be questioned even though grounds for a challenge for ·cause cannot be established, on the other hand. *See Commonwealth v. Slocum, supra,* 559 A.2d at 53 n. 3.

Defense counsel raised several objections during *voir dire*. First, he argued unsuccessfully that the venire should have been questioned *more generally* regarding whether they or their close relatives had been a victim of *any* crime of violence, rather than only regarding robbery. (N.T. 11/17/87 at 29–30). Later, defense counsel objected:

> ... *I can't even begin to intelligently exercise peremptory challenges with the kind of perfunctory questions that this Court engaged in here.* I don't even know the age of these people. I don't know how long they have been working at their jobs. I don't know whether or not they have ever had any prior jury service. I don't know if they had contact with people in law enforcement. These people that say they work for the Federal Government, I don't even know what kind of work they do. Are they secretaries? Are they running a branch of government? Are they head of the department? I have absolutely no idea. *How can I possibly effectively exercise my peremptory challenges?*
>
> So I would ask the Court to conduct a more detailed examination of these jurors. I don't know how long they have lived in the area where they lived. I would ask the Court to inquire as to that.

(N.T. 11/17/87 at 38–39). (Emphasis added). This objection was rephrased and renewed twice during the jury selection process. (N.T. 11/17/87 at 44–45, 48).

On appeal, appellant renews his contention that the trial court erred in refusing to question the venire generally whether they or close family members had been victimized by violent crime, rather than questioning them specifically as to robbery only. We find no abuse of discretion. In denying that request, the trial court acted in accordance with well established precedent that questions regarding criminal victimization in general are overbroad. *Commonwealth v. Johnson*, 358 Pa.Super. 435, 441–42, 517 A.2d 1311, 1314–15 (1986); *Commonwealth v. Davis*, 282 Pa.Super. 51, 422 A.2d 671, 672 (1980); *Commonwealth v. Mosley*, 261 Pa.Super. 198, 262, 395 A.2d 1384, 1386 (1978).

Contrary to appellant's assertions, we do not find that *voir dire* was unduly restricted in this respect.[11]

■ Appellant also contends that the trial court abused its discretion by refusing to question the members of the venire as to whether they had previous jury service. During *voir dire* counsel incorporated this issue in his general objection that the scope of *voir dire* was inadequate to foster intelligent use of peremptory challenges. (N.T. 11/17/87 at 38–39, 44–45, 48). On appeal, however, this objection has been cast in an entirely different light. Appellant now argues that inquiry regarding prior jury service was required because of reports of improper pressures being put upon juries by judges and their clerks in Philadelphia County. (Appellant's Brief at 56–59). He cites *Commonwealth v. Syre*, 348 Pa.Super. 110, 501 A.2d 671 (1985), *rev'd* 513 Pa. 1, 518 A.2d 535 (1986), as a case in which such misconduct occurred, and argues that the venire should have been questioned on *voir dire* to determine whether they had prior jury service experience, and then whether such misconduct occurred during their prior jury service. We find no abuse of discretion in the trial court's refusal to question the venire members regarding prior jury service.

Initially, we note that we reject entirely appellant's novel claim that prior jury service should have been disclosed because of the possibility that jurors might have been prejudiced, presumably against the accused, based upon misconduct (designed to improperly influence the jury to convict) which might have occurred at a previous unrelated trial. This novel theory was not raised in the trial court and must therefore be deemed to have been waived. *Commonwealth v. Johnson*, 355 Pa.Super. 123, 140–41, 512 A.2d

11. We note, additionally, that the trial court's solicitousness for the legitimate privacy interest of the members of the venire by rejecting overbroad *voir dire* questions was also demonstrated by the trial court's decision not to ask an allegedly overbroad question proposed by the prosecution, *i.e.* whether any members of the venire had ever been charged with or convicted of a crime. (N.T. 11/17/87 at 13).

1242, 1251 (1986).[12]

The tenor of the objection originally raised during *voir dire* was that prior jury service was a fact relevant to the "intelligent" exercise of peremptory challenges. (N.T. 11/17/87 at 38–39, 44–45). On appeal, appellant briefly renewed this claim, though he focused the main thrust of his argument on the novel contention discussed and rejected above. (Appellant's Brief at 55–56). Though this objection was properly preserved, we find it to be meritless.

Criminal defense counsel have traditionally preferred new jurors to experienced jurors, and have been advised in treatises, practice manuals, and law reviews to attempt to discover prior jury service during *voir dire* and then consider that factor in exercising peremptory challenges. *See e.g.* Rosenblatt, *Techniques for Jury Selection*, 2 Crim.L.Bull. 14, 19 (1966). Recent empirical research has produced mixed results regarding the significance of prior jury service, with some studies showing a small but statistically relevant correlation between juror experience and the likelihood of conviction, and other studies showing no correlation. *Compare* Dillehay & Nietzel, *Juror Experience and Jury Verdicts*, 9 Law & Hum.Behav. 179, 179–91 (1985) (noting a small but statistically significant correlation) *and* Kerr, *Effects of Prior Juror Experience on Juror Behavior*, 2 Basic & Applied Soc.Psych. 175, 175–93 (1981) (finding no correlation).

Jury selection techniques have "progressed" in recent years from reliance on the "conventional wisdom" of experienced members of the bar to increased reliance upon com-

**12.** We note that the only instance of alleged misconduct reported by appellant in support of his assertion of *general* misconduct is that alleged in *Commonwealth v. Syre, supra.* Our Supreme Court, however, held in *Syre* that there was sufficient evidence to support the trial court's finding that *no misconduct occurred.* 518 A.2d at 535–36. Moreover, even assuming that the issue had been properly raised and preserved, and misconduct had occurred in other cases as suggested, we would still find that the trial court would have been acting within its sound discretion in refusing to conduct *voir dire* regarding matters of such extremely limited probability and such tenuous relevance to the qualifications of the members of the venire to serve in the present case.

puter analysis of "characteristic based statistical probabilities." *See generally* Schwartz & Fleming, *To Know Your Jurors, Know Their Community*, 2 Crim.Justice 21, 21–3 & 47–8 (1988); Roberts, *Is This a Case That Warrants a Jury and Trial Consultant*, 10 Trial Dipl.J. 15, 15–23 (1987); Winston & Winston, *The Use of Sociological Techniques in the Jury Selection Process*, 6 J.Crim.Def. 79, 79–97 (1980). Though the bounds of the evolving constitutional restrictions upon group based discrimination in the exercise of peremptory challenges are as yet loosely defined, it is generally agreed, however, that to the extent peremptory challenges are allowed, there is no constitutional objection to the exercise of peremptory challenges in accordance with either "conventional wisdom" or "characteristic based statistical probabilities" so long as discrimination on the basis of race, religion, sex, or national origin does not result. *See* Comment, *The Prosecutor's Right to Object to a Defendant's Abuse of Peremptory Challenges*, 93 Dickinson L.Rev. 143, 143–67 (1988); Serr & Manley, *Racism, Peremptory Challenges, and the Democratic Jury*, 79 J.Crim.L. & Crim. 1, 1–65 (1988); Note, *Batson v. Kentucky and the Prosecutorial Peremptory Challenge*, 74 Va.L. Rev. 811, 811–41 (1988); Note, *Discrimination By the Defense: Peremptory Challenges After Batson v. Kentucky*, 88 Columb.L.Rev. 355, 355–68 (1988); Comment, *The Prohibition of Group Based Stereotypes in Jury Selection Procedures*, 25 Vill.L.Rev. 339, 339–63 (1980).

This does not mean, however, that trial courts are required to permit counsel to inquire as to any matter which conventional wisdom or computer analysis would deem relevant to the *intelligent* exercise of peremptory challenges. Indeed, the scope of such inquiry would be virtually limitless. In 1936, Clarence Darrow explained:

Choosing jurors is always a delicate task. The more a lawyer knows of life, human nature, psychology, and the reactions of the human emotions, the better he is equipped for the subtle selection of his so-called 'twelve men, good and true.' *In this undertaking, everything*

*pertaining to the prospective juror needs to be questioned and weighed: his nationality, his business, religion, politics, social standing, family ties, friends, habits of life and thought; the books and newspapers he likes and reads, and many more matters that combine to make a man;* all of these qualities and experiences have left their effect on ideas, beliefs and fancies that inhabit his mind.

Darrow, "Attorney for the Defense: How to Pick a Jury," *Esquire Magazine* (May 1936), *reprinted in* Darrow, *Verdicts Out of Court*, at 311–24 (1963). (Emphasis added). Darrow found virtually every aspect of a juror's life relevant to the intelligent exercise of peremptory challenges. Today, social scientists aided by computer analysis would be likely to find relevance in factors even Clarence Darrow might have deemed irrelevant. For example, a recent study suggested that significant statistical probabilities regarding jurors' views toward capital punishment could be gauged by such seemingly innocuous factors as how much television jurors watched, or how well they liked their neighbors. *See* Winston & Winston, *supra*, 6 J.Crim.Def. at 81. *Voir dire* as intrusive as a social scientist aided by computer analysis might desire in order to assist counsel to "intelligently" exercise peremptory challenges would be likely to leave the venire without a stitch of privacy or a shred of dignity. *See Commonwealth v. Slocum, supra,* 559 A.2d at 54–55.

However, in Pennsylvania, neither the prosecution nor the defense have a "right" to *voir dire* on matters addressed solely to the "intelligent" or tactical use of peremptory challenges. *See Commonwealth v. England, supra; Commonwealth v. Hathaway, supra. Commonwealth v. Slocum, supra,* 559 A.2d at 55. Rather, *voir dire* may properly be limited to questioning reasonably designed to uncover bias or prejudice harbored by individual members of the venire.

The discovery of factors such as prior jury service, which in no way call into question a *particular* juror's ability to render a fair and impartial verdict, is simply not within the

scope of proper *voir dire* inquiry—regardless of the statistical probabilities attendant to prior jury service in general.[13] Consequently, we find no abuse of discretion in the trial court's refusal to question the venire as to whether they had prior jury experience. *See Commonwealth v. Johnson,* 452 Pa. 130, 136, 305 A.2d 5, 8 (1973); *Commonwealth v. Corbin,* 426 Pa. 24, 26, 231 A.2d 138, 139 (1967); *Commonwealth v. Hathaway, supra,* 500 A.2d at 448; *accord* Annotation, *Voir Dire,* 28 ALR Fed. 26, 87–88 (1979 & 1988 Supp.) (collecting cases).

## III. MISTRIAL: PHOTOGRAPH BOOKS

■ Appellant next contends that the trial court erred in failing to declare a mistrial when Mrs. Flounders indicated that she had viewed "books" of photographs at the police station, though she also testified that she did not identify appellant's photograph. Mr. Keisler testified that he had identified appellant's photograph from several hundred photographs. Appellant reasons that taken together, the testimony conveyed the message that the photographs were "mug shots," and therefore, he was prejudiced by this indirect reference to unspecified prior criminal acts. We find no merit in this contention.

A motion for a mistrial is addressed to the sound discretion of the trial court and a decision on such a motion will not be reversed absent a clear abuse of discretion. *See Commonwealth v. Johnson,* 516 Pa. 527, 532–34, 533 A.2d 994, 997 (1987); *Commonwealth v. Howard,* 375 Pa.Super.

---

**13.** Though cloaked in the scientific garb of computer analysis, "characteristic based statistical probability" indicators for jury selection remain as conjectural as to *particular* members of the venire as the outdated "conventional wisdom" they have begun to replace. Neither tell us anything relevant to the disposition of a challenge to a particular member of a venire for cause.

We note that a statistically significant correlation between belief in the jury system and the likelihood of conviction has also been reported. *See* Sealy, *Another Look at Social Psychological Aspects of Juror Bias,* 5 Law & Hum.Behav. 187, 187–200 (1981). Such "bias" is hardly likely, though, to impress trial or appellate courts as a legitimate basis upon which to question or challenge prospective jurors. *See Commonwealth v. Slocum, supra,* 559 A.2d at 55 n. 7.

43, 52, 543 A.2d 1169, 1174–75 (1988). Mrs. Flounders' vague reference to the books of photographs she viewed at the police station and Mr. Keisler's reference to hundreds of photographs did not require a mistrial. *See Commonwealth v. Banks,* 513 Pa. 318, 521 A.2d 1 (1987), *cert. denied* 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987); *Commonwealth v. Brown,* 511 Pa. 155, 512 A.2d 596, (1986); *Commonwealth v. Cambridge,* 386 Pa.Super. 542, 563 A.2d 515 (1989). Moreover, the trial court sustained counsel's objection to Mrs. Flounders' vague reference and permitted the prosecution to move on with its questioning regarding relevant identification evidence without focusing undue attention on her relatively insignificant remark. We find no error or abuse of discretion in this course of conduct.

## IV. JURY CHARGE

Appellant next contends that the trial court erred by failing to properly charge the jury regarding the impeachment and evidentiary value of prior inconsistent statements, the burden of proof, and identification issues. He argues that the jury charge on these issues was misleading, incomplete, and erroneous.

The standard for review for challenges to the trial court's charge to the jury was set forth at length in *Commonwealth v. Alvin,* 357 Pa.Super. 509, 518–19, 516 A.2d 376, 381 (1986). *See also Commonwealth v. Grove,* 363 Pa.Super. 328, 341–42, 526 A.2d 369, 376 (1987), *allocator denied* 517 Pa. 630, 539 A.2d 810 (1987). Applying this standard, we find no merit in appellant's challenges to the jury charge given in this case.

■ Because appellant failed to establish sufficient evidence that a prior inconsistent statement had been made by the Commonwealth witness, no special instruction regarding such evidence was necessary or appropriate. *See Commonwealth v. Freeman,* 356 Pa.Super. 332, 343, 514 A.2d 884, 890 (1986); *see generally Commonwealth v. Grove,*

*supra,* 526 A.2d at 378 (a jury charge may only be given where there is evidence to support the charge). Assuming, *arguendo,* that evidence of a prior inconsistent statement, though weak, was sufficient to warrant a jury instruction, we find the trial court's general instruction that the jury should consider whether the witnesses were contradicted or contradicted themselves in assessing credibility, was adequate to cover the point.

We note that appellant was not entitled to a charge on the substantive use of prior inconsistent statements. The distinction between substantive and merely corroborative evidence is addressed solely to the issues of whether the evidence may be admitted, and whether it may be considered in determining whether a burden of proof or production has been met. *See Commonwealth v. McMillan,* 376 Pa.Super. 25, 38–41, 545 A.2d 301, 308–09 (1988). Here, as in *McMillan,* the prior inconsistent statement had been admitted into evidence, and appellant bore no burden of production or proof. Consequently, the characterization of the statement was not relevant, and no jury instruction regarding the corroborative or substantive use distinction was necessary or appropriate. *Id.*

Finally, the trial court's charges regarding the Commonwealth's burden of proof and the evaluation of the eyewitness identification evidence were correct and complete. Reviewing the charge as a whole, and considering appellant's contentions individually and collectively, we find no error with respect to the charge to the jury.

## V. MISTRIAL: PROSECUTOR'S SUMMATION

Appellant next contends that prosecutorial misconduct during the prosecutor's closing argument warranted a mistrial and that the trial court erred in failing to grant appellant's request for one following the conclusion of the prosecutor's summation. Appellant argues that the prosecutor mischaracterized the defense, derided defense coun-

sel, and improperly injected his personal opinions into the argument.

The standard for review of such claims was recently set forth at length in *Commonwealth v. Johnson, supra,* 533 A.2d at 997; *see also Commonwealth v. Howard, supra,* 543 A.2d at 1174–75. Applying this standard, we find no reason to reverse the trial court's decision to deny the motion for a mistrial.

Upon careful review of the record, we find no merit in the suggestion that the prosecutor improperly mischaracterized the defense or derided defense counsel. Rather, the prosecutor merely made appropriate, albeit unflattering, inferences from the evidence presented. Moreover, while it appears that the prosecutor improperly personalized his argument to the jury by using language which may have suggested personal belief, rather than professional argument, we do not find that the prosecutor's arguably improper conduct in that respect undermined the truth determining process. *Cf. Commonwealth v. Slocum, supra,* 559 A.2d at 56–57. To the contrary, while both prosecution and defense took full advantage of the loose reign held by the trial court over those arguments, we do not believe that the reign was so loose as to permit the jury to be stampeded by counsels' arguments. Finally, we again note and emphasize that in such matters we are inclined to defer to the trial court's superior vantage in accessing the probable impact of the challenged conduct on the jury. *See Commonwealth v. Slocum, supra,* 559 A.2d at 57; *Commonwealth v. Howard, supra,* 543 A.2d at 1179 (Kelly, J., concurring). The trial court found no grounds for a mistrial. We find no abuse of discretion with respect to the trial court's ruling on the mistrial motion.

## CONCLUSION

Based upon the foregoing, judgment of sentence is affirmed.