896 F.Supp. 968 (1995)
UNITED STATES of America, Plaintiff,
v.
Marco Antonio PADILLA-VALENZUELA, Defendant.
No. CR 95-057 TUC JMR.
United States District Court, D. Arizona.
August 21, 1995.
*969 Jesse J. Figueroa, Assistant U.S. Attorney, Tucson, AZ, for plaintiff.
Hector M. Figueroa, Tucson, AZ, for defendant.

ORDER
ROLL, District Judge.
Defendant MARCO ANTONIO PADILLA-VALENZUELA has filed a motion to submit a questionnaire to prospective jurors and motion for attorney conducted voir dire.[1] These motions, in a broader sense, address at what point an attorney's right to gather information about prospective jurors conflicts with prospective jurors' right to privacy.

FACTUAL CONTEXT
The defendant is charged in a one count indictment with possession with intent to distribute cocaine. The government alleges that the defendant possessed over one ton of cocaine on January 23, 1995, in a remote canyon near Nogales, Arizona. At the time the defendant was arrested, he was illegally in the United States.

PROPOSED QUESTIONNAIRE
The questionnaire submitted by the defendant seeks information concerning the educational background of (a) each juror, (b) each juror's spouse, and (c) the children of each prospective juror. It also inquires as to whether prospective jurors have "read or heard about the issue regarding immigrants in California" and whether any prospective juror believes "a similar situation should be promoted nationally." The questionnaire asks whether any prospective juror or the family member of any prospective juror has "ever been a member of any racially-exclusive clubs, or clubs where even though not avowedly discriminatory  there are no minority members." The questionnaire asks whether any prospective juror has "ever used derogatory language in referring to members of a minority group," "ever expressed an opinion on the `wasted' finances used to defend immigrants charged with unlawful conduct," "ever made any statement to or about *970 immigrants (whether legal or illegal) that would demonstrate an appearance of bias," "believed that immigrants (whether legal or illegal) dominate the welfare roles," and "believe immigrants (whether legal or illegal) are taking jobs from United States citizens."
In support of this questionnaire, defendant cites four Ninth Circuit cases. Three of these cases address the district court's refusal to question prospective jurors as to whether they would tend to give greater weight to the testimony of a law enforcement officer than to that of any other witness simply because a witness was a law enforcement officer. See United States v. Contreras-Castro, 825 F.2d 185, 187 (9th Cir.1987); Darbin v. Nourse, 664 F.2d 1109, 1114-16 (9th Cir. 1981); United States v. Baldwin, 607 F.2d 1295, 1297-99 (9th Cir.1979). The fourth case pertains to the district court's refusal to inquire whether any prospective jurors "knew any of the government's witnesses." See United States v. Washington, 819 F.2d 221, 223-25 (9th Cir.1987).
Defense counsel has also filed a "Motion for Attorney Conducted Voir Dire." This motion is predicated upon defense counsel's desire to explore the "anti-immigrant fervor" of prospective jurors.

VOIR DIRE
During voir dire, the district court has an obligation to ascertain whether actual bias exists. Dennis v. United States, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950). The trial court maintains wide discretion in conducting voir dire into areas which may reveal bias. Mu'Min v. Virginia, 500 U.S. 415, 111 S.Ct. 1899, 1906, 114 L.Ed.2d 493 (1991). "The trial court must conduct voir dire in a manner that permits the informed exercise of both the peremptory challenge and the challenge for cause." Darbin, 664 F.2d at 1113.
In drug prosecutions, this court typically uses a standard procedure during voir dire. It is the practice of this court to submit a brief questionnaire designed to elicit information concerning substance abuse problems encountered by prospective jurors, prospective jurors' family members, and close friends. This question is optional. A second question, which must be answered, inquires as to whether there is anything about the fact that this case involves a drug prosecution which would prevent any prospective juror from serving as a fair and impartial juror. In the event of an affirmative response, further explanation is required. This court also asks prospective jurors whether they know any witnesses, have served on a grand jury, have been a witness in a criminal case, or have close friends or relatives who work in law enforcement. Prospective jurors are asked questions concerning certain principles of law pertaining to criminal prosecutions. They are asked whether any of the prospective jurors or close friends or relatives of prospective jurors have ever been convicted of a crime other than a traffic offense. The court also requests that each prospective juror answer questions listed on a board which is placed on an easel in front of the panel. These inquiries include the general area where each prospective juror lives, the prospective juror's occupation and spouse's occupation, and prior jury service. Where applicable, prospective jurors are asked whether there is anything about the fact that the defendant is Hispanic which would in any way enter into how they would decide the case. Counsel is then invited to request that the court inquire as to any other matters counsel feel should be explored.

QUESTIONNAIRES
More recently, questionnaires have become a favored device of trial lawyers. In a recent murder prosecution in Texas, prospective jurors were required to answer a questionnaire containing 110 separate questions. The prospective jurors were required to state their combined family income, their religious preference including the denomination and specific church attended, their political affiliation, and whether they characterized themselves as liberal, conservative, or moderate. See Brandborg v. Lucas, 891 F.Supp. 352 (E.D.Tex.1995). Similarly, in a highly publicized murder trial conducted in California, prospective jurors were required to answer queries on a questionnaire, including whether they were a member of any private club which limited its membership on the basis of religion, their religious affiliation or preference, "[h]ow important ... religion is in [the *971 prospective juror's] life," how often religious services are attended, political affiliation, and any charities or organizations to which the prospective jurors contribute. Juror Questionnaire, People v. Simpson, No. BA097211, 1994 WL 564388 (Cal.Sup.Ct. Oct. 3, 1994).
These questionnaires are in keeping with the tradition of Clarence Darrow, who once explained:
Choosing jurors is always a delicate task ... in this undertaking, everything pertaining to the prospective juror needs to be questioned and weighed: his nationality, his business, religion, politics, social standing, family ties, friends, habits of life and thought; the books and newspapers he likes and reads, and many more matters that combine to make a man; all of these qualities and experiences have left their effect on ideas, beliefs and fancies that inhabit his mind.
Clarence Darrow, Attorney for the Defense: How to Pick a Jury, Esquire, May, 1936.
The relatively recent entry of social scientists[2] assisted by computer analysis has undoubtedly expanded the scope of matters attorneys find useful in selecting prospective jurors. Commonwealth v. Gibson, 389 Pa.Super. 518, 541-44, 567 A.2d 724, 735-37 (1989), appeal dismissed, 530 Pa. 24, 606 A.2d 897 (1992). See also Steven J. Adler, The Jury 113-115 (1994); Abramson, supra note 2, at 143-176.
While the trial lawyer's appetite for information concerning prospective jurors may be insatiable, the burden is borne by prospective jurors. As the scope of inquiry during voir dire has relentlessly expanded, resistance has been expressed by or on behalf of prospective jurors. See, e.g., Brandborg, 891 F.Supp. 352; Newton N. Minow & Fred H. Cate, Court Quiz Show: Grilling Jurors by Questionnaire, Wall St. J., Oct. 12, 1994, at A14 ("[I]ntrusive jury questionnaires violate the privacy rights of citizens called for jury service."); Wake-up Call to Courts: Jurors Have Rights, Too, USA Today, Dec. 21, 1992, at 11A ("[I]t's absolutely outrageous to ask some of the personal questions that are on those questionnaires. I would absolutely refuse.") (quoting Don C. Keenan, president of American Board of Trial Advocates).
Certain areas may be explored despite potential embarrassment to prospective jurors. Precautionary measures may be taken to minimize embarrassment.
Courts have determined that other sensitive areas, however, are simply beyond the scope of inquiry, regardless of available means to minimize embarrassment. See, e.g., United States v. Barnes, 604 F.2d 121, 139-43 (2nd Cir.1979), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); United States v. Taylor, 562 F.2d 1345, 1355 (2nd Cir.) (educational backgrounds and whether prospective jurors had children), cert. denied sub nom., 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); United States v. Hamling, 481 F.2d 307, 314 (9th Cir.1973) (views towards sex and obscenity), aff'd, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); United States v. Workman, 454 F.2d 1124, 1128 (9th Cir.) (attitudes toward drug users, political activists, and antiwar demonstrators), cert. denied, 409 U.S. 857, 93 S.Ct. 138, 34 L.Ed.2d 102 (1972); Maguire v. United States, 358 F.2d 442, 444-45 (10th Cir.) (bias against homosexuals), cert. dismissed, 385 U.S. 801, 87 S.Ct. 9, 17 L.Ed.2d 48, cert. denied, 385 U.S. 870, 87 S.Ct. 138, 17 L.Ed.2d 97 (1966); Yarborough v. United States, 230 F.2d 56, 63 (4th Cir.) (religious backgrounds and affiliations), cert. denied, 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487 (1956). See also Brandborg, 891 F.Supp. 352; Allen v. Snow, 489 F.Supp. 668 (D.Mass.1980), aff'd, 635 F.2d 12 (1st Cir. 1980), cert. denied, 451 U.S. 910, 101 S.Ct. 1981, 68 L.Ed.2d 299 (1981); State v. Mills, 62 Ohio St.3d 357, 582 N.E.2d 972 (1992), cert. denied, ___ U.S. ___, 112 S.Ct. 3048, 120 L.Ed.2d 915 (1992); Gibson, supra; Michael R. Glover, The Right to Privacy of Prospective Jurors During Voir Dire, 70 Cal. L.Rev 708 (1982).[3]
*972 Nor is it satisfactory to merely excuse any prospective jurors who object to unduly invasive questioning. To be meaningful, the right to privacy must preclude the offending questions from being asked of any prospective jurors. Recent case law has recognized that individual prospective jurors maintain equal protection rights during jury selection. J.E.B. v. Alabama ex rel. T.B., ___ U.S. ___, 114 S.Ct. 1419, 1422, 128 L.Ed.2d 89 (1994) (gender); Shaw v. Hahn, 56 F.3d 1128, 1130 (9th Cir.1995) (race).
Clearly, not all courts have been generous in recognizing prospective jurors' right to privacy. See, e.g., Brandborg, supra (underlying state action); United States v. Dellinger, 472 F.2d 340 (7th Cir.1972), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); People v. Wells, 149 Cal.App.3d 721, 197 Cal.Rptr. 163 (Cal.App.2 Dist.1983).
However, "nothing about becoming a prospective juror amounts to a willing waiver of an expectation of privacy." Brandborg, 891 F.Supp. at 357. Prospective jurors are summoned, they do not volunteer. Jurors are not on trial. See Barnes, 604 F.2d at 140; Allen, 489 F.Supp. at 672. Many individuals have demonstrated a reluctance to serve by their failure to even appear for jury duty.[4] Perhaps most distressing, prospective jurors may find that unless the trial judge monitors the scope of inquiry, no one will be concerned about their privacy.[5] "While the parties have attorneys to champion their rights, the courts must protect the privacy rights of the prospective jurors." Brandborg, 891 F.Supp. at 356.
The Sixth Amendment guarantees that the accused in a criminal prosecution "shall enjoy the right to ... trial by an impartial jury ..." Neither the prosecution nor the defense has the right to have voir dire conducted in such a way as to mold the jury in a way that the jury will be receptive to counsel's case. In Schlinsky v. United States, 379 F.2d 735, 738 (1st Cir.), cert. denied, 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967), the First Circuit stated:
[I]n our opinion the purpose of the voir dire is to ascertain disqualifications, not to afford individual analysis in depth to permit a party to choose a jury that fits into some mold that [counsel] believes appropriate for [counsel's] case.
A Pennsylvania appellate court has stated that "neither the prosecution nor the defense have a `right' to voir dire on matters addressed solely to the `intelligent' or tactical use of preemptory challenges." Gibson, 389 Pa.Super. at 543, 567 A.2d at 736.
In rejecting unduly invasive questioning of prospective jurors, the Second Circuit stated:
If Darrowesque questioning of prospective jurors were allowed, namely "religion, politics, social standing, family ties, friends, habits of life and thought", any semblance of juror privacy would have to be sacrificed. There is neither statutory nor constitutional law that requires disclosure of information about jurors unrelated to any issue as to which prejudices may prevent an impartial verdict.
Barnes, 604 F.2d at 143 (footnote omitted).
Many of the matters listed on defendant's proposed questionnaire are unduly invasive and violate the right to privacy of prospective jurors. Other matters sought to be explored are already covered by the standard voir dire procedure used in drug cases by this court. The reasons tendered by defendant for attorney conducted voir dire, that is, exploration of prospective jurors' potential "anti-immigrant fervor," are also perniciously invasive of the right to privacy.
Accordingly,
*973 IT IS ORDERED that defendant's motion to submit a questionnaire to prospective jurors is DENIED to the extent that it is a request that the questionnaire submitted by defense counsel be submitted to prospective jurors.
IT IS FURTHER ORDERED that defendant's motion for attorney conducted voir dire is DENIED.
NOTES
[1] These motions were filed by defendant's previous counsel and adopted by present counsel.
[2] The first highly publicized use of scientific jury selection methods occurred in 1972. Jeffrey Abramson, We, The Jury 148 (1994).
[3] An additional reason for restricting access to such private information is its dubious value. "In the end, we all belong to so many overlapping groups that science cannot forecast whether a juror will respond to the evidence more as, say, a woman, a white, a thirty-year-old, a Lutheran, a Norwegian, a college graduate, a member of the middle class, a Republican, or whatever." Abramson, supra note 2, at 145-46.
[4] See Andrea Gerlin, Jury Duty Scofflaws Try Patience of Courts, Wall St. J., Aug. 9, 1995, at B1, B8.
[5] In Brandborg, 891 F.Supp. at 355, when a prospective juror balked at disclosing her religion, income, and political affiliation, the prosecutor stated that her refusal was an insult to the court and defense counsel asserted that "she should do it or suffer the consequences."